2009 ME 89

**Anthony ULIANO et al.**

**v.**

**BOARD OF ENVIRONMENTAL PROTECTION.**

Supreme Judicial Court of Maine.

Argued: May 19, 2009.
Decided: Aug. 13, 2009.

---

Edmond J. Bearor, Esq., Timothy A. Pease, Esq. (orally), Rudman & Winchell, LLC, Bangor, ME, for Anthony and Erin Uliano.

Janet T. Mills, Atty. Gen., Margaret A. Bensinger, Asst. Atty. Gen. (orally), Christopher Taub, Asst. Atty. Gen., Augusta, ME, for Maine Board of Environmental Protection.

Phoebe B. Boyer, Salsbury Cove, ME, for Intervenors.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, and GORMAN, JJ.

Majority: SAUFLEY, C.J., and CLIFFORD, LEVY, and GORMAN, JJ.

Dissent: ALEXANDER, J.

LEVY, J.

[¶ 1] Anthony and Erin Uliano appeal from a judgment entered in the Superior Court (Hancock County, *Cuddy, J.*) affirming the Board of Environmental Protection's order denying their application for a permit to build a pier pursuant to the Natural Resources Protection Act, 38 M.R.S. §§ 480–A to 480–GG (2008).[1] The Ulianos raise numerous issues on appeal, including that the scenic and aesthetic uses standard in section 480–D(1) is unconstitutionally vague, that the Board erred in performing the practicable alternatives analysis required by section 5(A) of the Wetland Protection Rules, and that they have been deprived of their common law right to wharf out. We affirm the judgment.

---

1. The Natural Resources Protection Act, currently codified at 38 M.R.S. §§ 480–A to 480–GG (2008), has been amended since the Ulianos first applied for a permit. The amendments do not affect the issues raised by the Ulianos, and are therefore not relevant to our analysis. *See* 38 M.R.S.A. §§ 480–A to 480–Z (2001).

## I. CASE HISTORY

[¶ 2] This is the second time the Ulianos have appealed an order of the Board of Environmental Protection (Board) denying their application for a permit to build a pier. We vacated the Board's first order. *See Uliano v. Bd. of Envtl. Prot. (Uliano I)*, 2005 ME 88, 876 A.2d 16.

[¶ 3] The Ulianos own waterfront property adjacent to Salsbury Cove on Eastern Bay in Bar Harbor with approximately 215 feet of shore frontage. The supra-tidal zone of the Ulianos' shoreline consists of a ledge outcropping approximately ten feet high, and the intertidal zone consists of gravel, cobble, boulder, and ledge. The shoreline at the eastern end of the Ulianos' property is not as steep as other portions of their shoreline, and an existing stairway at that location provides access to a sand, gravel, and cobblestone beach. On the east, the Ulianos abut the Sand Point Association Common Lot. On the west, the Ulianos abut property held by Rosecliff Cottages, LLC, a company owned and operated by the Ulianos.

[¶ 4] In February 2001, the Ulianos applied for a Natural Resources Protection Act (NRPA) permit to construct a 95' × 6' private, recreational pier with a 50' seasonal aluminum ramp and 16' × 20' wooden float. The height of the pier would be approximately seventeen feet at mean low water. The purpose of the pier is to provide access to a recreational boat and to permit swimming at all tides. The Ulianos' application generated significant public interest, resulting in a request that the Board assume jurisdiction over the application. The Board declined jurisdiction, and in August 2001 the staff of the Department of Environmental Protection (Department) approved the Ulianos' application.

[¶ 5] In September 2001, abutters to the Ulianos' property appealed the Department's order to the Board. The Board granted the appeal in February 2002, finding that the use of a dinghy in conjunction with a mooring was a practicable alternative to the proposed pier, that the cumulative impact of the pier would be significant, and that the pier would unreasonably interfere with existing scenic and aesthetic uses of the coastal wetland. The Ulianos appealed the Board's decision to the Superior Court, which affirmed the Board's order. The Ulianos then appealed the Superior Court's judgment, which we vacated with instructions that the case be remanded to the Board for further findings. *See Uliano I*, 2005 ME 88, ¶ 26, 876 A.2d at 23.

[¶ 6] Specifically, we found that the Board had promulgated two regulations in its Wetland Protection Rules that require an analysis of practicable alternatives and an assessment of cumulative impact, but failed to relate these two additional regulatory requirements to the Board's overall evaluation, pursuant to section 480–D(1), of whether the pier would unreasonably interfere with existing scenic and aesthetic uses. *Id.* ¶¶ 11–14, 18–20, 876 A.2d at 19–20, 21. We found that the Board further erred by grounding its finding of cumulative impacts on speculation that the Ulianos' pier would generate more pier construction. *Id.* ¶¶ 19–20, 876 A.2d at 21. Finally, we found that the Board's section 480–D(1) findings did not permit meaningful appellate review because the findings merely summarized the evidence and failed to explain why the Ulianos' pier would unreasonably interfere with existing scenic and aesthetic uses. *Id.* ¶¶ 23, 25, 876 A.2d at 21–22.

[¶ 7] On remand, the Board reopened the record to receive additional evidence on practicable alternatives to the proposed pier and impacts of the proposed pier on existing scenic, aesthetic, recreational, and navigational uses. The Board conducted

two site visits in October 2005 and held a public hearing in March 2006.

[¶ 8] In February 2007, the Board again denied the Ulianos' application. In its decision, the Board first addressed the issue of practicable alternatives and noted that it was considering the existence of practicable alternatives as a factor in its assessment of whether the proposed pier would unreasonably interfere with existing scenic and aesthetic uses of the coastal wetland. The Board then found that the Ulianos had at least two practicable alternatives to constructing a pier. First, it determined that the Ulianos could use a dinghy and an outhaul system to access a boat on a mooring based on evidence that such a system is commonly used throughout Eastern Bay and was used by the previous owner of the Ulianos' property. Second, it determined that the Ulianos could maintain their boat at a yacht club located approximately three miles away.

[¶ 9] The Board then turned to its analysis of section 480–D(1) to determine whether the proposed pier would unreasonably interfere with existing scenic, aesthetic, recreational, and navigational uses of the coastal wetland. The Board concluded that the proposed pier would have a significant adverse impact on several existing scenic and aesthetic uses of the coastal wetland, including "persons walking the intertidal area, enjoying the common area of the Sand Point Association, [and] boating in the near-shore area of Eastern Bay." The Board based this finding on evidence that Eastern Bay is "relatively undisturbed and unobstructed" and contains only two piers; that access to Eastern Bay is achieved primarily through walkways, paths, and stairways; and that the Ulianos' proposed pier would traverse the intertidal area and dominate the landscape:

The Board finds that the relevant stretch of shoreline when considering potential scenic and aesthetic impacts of this project is within Eastern Bay, from Hadley Point to Parker Point. This area is geographically distinct from the larger, deeper, and more open Frenchman Bay to the east. With the exception of the two older piers in Emery Cove and the walkway at the east of Sand Point, the permanent piers cited by the applicants are all located in Frenchman Bay and are not relevant to the Board's consideration of the impact of the proposed project on Eastern Bay. Within Eastern Bay, the Board finds that, due to the terrain, the configuration of the shoreline, and the nature of the existing development, the visual impact of the proposed pier will vary depending upon the vantage point from which it is viewed. The visual impact of the proposed pier will be greatest for persons walking the intertidal area, enjoying the common area of the Sand Point Association, or boating in the near-shore area of Eastern Bay. Given the nature of Eastern Bay, there is a relatively large expanse of intertidal area at low tide between Mount Desert Island Biological Laboratory to the west of the proposed development site and the Ovens to the east that is easily walked. Evidence in the record indicates that persons living in the vicinity of the proposed project enjoy walking this shoreline as tides permit. For these users of the coastal wetland, the pier would be a significant visual intrusion, traversing the entire width of the intertidal area (approximately 95 feet) at a height above grade of between ten feet (at the shoreline) to 17 feet (at mean low water). While persons walking the intertidal area would be able to pass beneath the dock, the dock would dominate the landscape and partially obstruct

and/or fragment the view along the intertidal area and across Eastern Bay, significantly detracting from the visual and aesthetic quality of the resource and thereby interfering with this use of the coastal wetland. In addition the proposed pier would be located approximately 160 feet west of the Sand Point Association Common Lot and would interfere with views of Eastern Bay from the Common Lot. The Board finds that the proposed pier would have a significant adverse impact on the scenic and aesthetic value of the wetland.

The Board also finds that the proposed pier would have a significant adverse scenic and aesthetic impact on the uses of the area by boaters in Eastern Bay and, in particular, kayakers and small boat users who frequent the near-shore area. Evidence in the record indicates that this area is used daily during the summer (weather permitting) by organized kayak groups who launch at Hadley Point to the west or Hulls Cove to the east. The project would also negatively impact such uses by neighbors who keep kayaks on the Sand Point Association Common Lot and who kayak in the immediate vicinity of the proposed project. The visual impact of the proposed project on boaters in Eastern Bay would diminish with increased distance, but the pier would continue to be visible at many points throughout the Bay especially when reflecting the sunlight.

For persons utilizing Lamoine Beach and Lamoine State Park located on the opposite shore of Eastern Bay, more than one mile across water from the proposed development site, the proposed pier would not generally be visible given the distance across Eastern Bay and the orientation of the pier.

With respect to other recreational and navigational uses, evidence in the record indicates that persons walking the intertidal area or kayaking near-shore will be able to pass beneath the pier between the granite cribs. While persons testified that they currently sail near-shore during high tide and that the proposed pier will limit their ability to do so, this limitation is not unreasonable given the size of Eastern Bay. The appellants also testified that the proposed pier, to be located approximately 160 feet west of the Sand Point Association Common Lot, may obstruct the use of the beach and the launching of small boats from this area; however, there is not sufficient evidence in the record to support this contention.

Based on the Board's site visit, photographs, testimony and other evidence in the record, the Board finds that the applicants' project will have an adverse impact on the existing scenic and aesthetic uses of the coastal wetland between Hadley Point and Parker Point for the reasons set forth above.

The Board also concluded that the proposed pier would not have an adverse impact on recreational and navigational uses of the coastal wetland.

[¶ 10] Having determined that the impact of the proposed pier on existing scenic and aesthetic uses would be adverse, the Board considered whether the impact would be unreasonable in light of the factors designated by section 5(D) of the Wetland Protection Rules.[2] Applying these

---

2. Pursuant to its duties under NRPA, the Board enacted the Wetland Protection Rules to help administer the criteria for permits listed by the statute. *See* 38 M.R.S. § 341-D(1–B) (2008). The factors provided by section 5(D) of the Wetland Protection Rules include:

> the degree of harm or benefit to the resource; the frequency of similar impacts; the duration of the activity and ability of the

factors, the Board concluded that the impact would be unreasonable because: (1) the proposed pier would not benefit the wetland and the harm to the aesthetic value of the wetland would be long-term; (2) the coastal wetland was not extensively developed and residents had refrained from building piers; (3) the pier would provide no public benefit; (4) the Ulianos would only benefit from the pier for a few months each summer; and (5) the Ulianos could already use their property for boating and swimming at most tide levels. In addition, the Board found the impact of the proposed pier would be unreasonable as the Ulianos had at least one practicable alternative.

[¶ 11] The Ulianos appealed the Board's decision to the Superior Court, which affirmed the Board's order. The Ulianos filed this appeal.

## II. STANDARD OF REVIEW

■■■■ [¶ 12] When the Superior Court acts in an appellate capacity to review a decision of an administrative agency, we review the agency's decision directly for an abuse of discretion, error of law, or findings not supported by the evidence. *York Ins. of Me., Inc. v. Superintendent of Ins.*, 2004 ME 45, ¶ 13, 845 A.2d 1155, 1159. "An

administrative decision will be sustained if, on the basis of the entire record before it, the agency could have fairly and reasonably found the facts as it did." *CWCO, Inc. v. Superintendent of Ins.*, 1997 ME 226, ¶ 6, 703 A.2d 1258, 1261. Where an appellant challenges the findings in an administrative decision, "the appellant cannot prevail unless he shows that the record compels contrary findings." *Kroeger v. Dep't of Envtl. Prot.*, 2005 ME 50, ¶ 8, 870 A.2d 566, 569. "Inconsistent evidence will not render an agency decision unsupported." *Seider v. Bd. of Exam'rs of Psychologists*, 2000 ME 206, ¶ 9, 762 A.2d 551, 555.

## III. DISCUSSION

■■■ [¶ 13] The Ulianos contend that: (A) the scenic and aesthetic uses standard in section 480–D(1) is unconstitutionally vague and the Board's conclusion that the proposed pier would adversely affect scenic and aesthetic uses is not supported by substantial evidence; (B) the Board erred in performing the practicable alternatives analysis as required by section 5(A) of the Wetland Protection Rules, and its conclusion that a practicable alternative exists is not supported by the record; and (C) the Board's order denies the Ulianos their common law right to wharf out.[3]

resource to recover; the proximity of the activity to protected or highly developed areas; traditional uses; the ability of the activity to perform as intended; public health or safety concerns addressed by the activity; and the type and degree of benefit from the activity (public, commercial or personal).

2 C.M.R. 06 096 310–5 § 5(D) (2007).

**3.** The remaining issues raised by the Ulianos do not merit lengthy discussion. First, the Ulianos contend that the Board's findings are inadequate because they are expressed in a narrative format and provide only a "mere recap" of the record evidence. Although the Board's decision sets forth a narrative summary of the witnesses, exhibits, and positions

of the parties, it is also interspersed with statements of fact that represent the Board's findings. *See In re Marpheen C.*, 2002 ME 170, ¶ 6, 812 A.2d 972, 974 (finding no error in narrative approach to fact-finding). As noted by the dissenting opinion, at the outset of its decision, the Superior Court was critical of the Board's narrative approach. This criticism is followed, however, by the court's comprehensive review of the Board's order and the court's conclusion that the order should be affirmed. Regardless of the strengths or weaknesses of the Board's narrative approach, the Board's ultimate findings of fact and legal conclusions can be readily identified in the Board's order. It is, therefore, susceptible to meaningful appellate review.

A. Title 38 M.R.S. § 480–D(1)

1. The Constitutionality of Section 480–D(1)

[¶ 14] Every applicant for a permit must demonstrate that the proposed activity meets nine standards set forth in section 480–D. *See* 38 M.R.S. § 480–D(1)–(9). In particular, the Ulianos challenge the "existing uses" requirement that:

> **1. Existing uses.** The activity will not unreasonably interfere with existing scenic, aesthetic, recreational or navigational uses

as being unconstitutionally vague and an unconstitutional delegation of authority. *See id.* § 480–D(1). The Ulianos contend that this standard, as applied to scenic and aesthetic uses, is overly subjective and provides no guidance as to how much interference with scenic and aesthetic uses is permissible.

[¶ 15] To a significant degree, both vagueness and unlawful delegation challenges are concerned with the issue of definiteness. Thus, a statute is vague "when its language either forbids or requires the doing of an act in terms so vague that people of common intelligence must guess at its meaning, or if it authorizes or encourages arbitrary and discriminatory enforcement." *Town of Baldwin v. Carter*, 2002 ME 52, ¶ 10, 794 A.2d 62, 67 (quotation marks omitted) (citation omitted). Similarly, legislation delegating discretionary authority to an administrative agency is unconstitutional if it fails to "contain standards sufficient to guide administrative action." *Lewis v. Dep't of Human Servs.*, 433 A.2d 743, 747 (Me.1981). In-

deed, vagueness and unlawful delegation are often raised simultaneously and properly treated as a single inquiry. *See Secure Env'ts, Inc. v. Town of Norridgewock*, 544 A.2d 319, 321–24 (Me.1988) (discussing whether an ordinance was "impermissibly vague, and thus represent[ed] an unconstitutional delegation of legislative authority"). Such is the case here.

[¶ 16] The operative terms of section 480–D(1), as they relate to scenic and aesthetic uses, are defined either by NRPA itself, by their plain meaning, or by reference to well-established legal principles. We consider, in turn, the terms (a) "activity"; (b) "existing scenic and aesthetic uses"; and (c) "unreasonably interfere"; and then consider these terms in relation to (d) whether a regulatory standard is necessarily void for vagueness if it is not susceptible to quantitative measurement.

a. "Activity"

[¶ 17] Section 480–D(1) only applies to the specific activities listed in section 480–C(2)(A)–(D):

> **A.** Dredging, bulldozing, removing or displacing soil, sand, vegetation or other materials;
>
> **B.** Draining or otherwise dewatering;
>
> **C.** Filling, including adding sand or other material to a sand dune; or
>
> **D.** Any construction, repair or alteration of any permanent structure.

38 M.R.S. § 480–C(2)(A)–(D). In addition, section 480–D(1) only applies when the foregoing activities are located in, on or over a protected natural resource, or adja-

---

Second, the Ulianos contend that the Board misapplied section 5(D) of the Wetland Protection Rules. Contrary to this contention, the Board appropriately considered the factors contained in section 5(D) in analyzing the impacts of the proposed pier on existing scenic and aesthetic uses.

Third, the Ulianos assert that the Board arbitrarily selected the geographic area relevant to its section 480–D(1) analysis. Contrary to the Ulianos' assertion, the Board's determination of the relevant geographic area was based on competent evidence in the record.

cent to specific natural resources. 38 M.R.S. § 480–C(1). Protected natural resources encompass a discrete collection of natural environments, including "coastal sand dune systems, coastal wetlands, significant wildlife habitat, fragile mountain areas, freshwater wetlands, community public water system primary protection areas, great ponds or rivers, [and] streams or brooks." 38 M.R.S. § 480–B(8).

b. "Existing Scenic and Aesthetic Uses"

[¶ 18] Section 480–D(1) employs "existing," "scenic," and "aesthetic" to describe "uses." A "use" is "the application or employment of something for some purpose." *The American Heritage Dictionary* 1331 (2d College ed. 1982). "Uses" involve human activity. A scenic or aesthetic use of a protected natural resource is therefore a human activity arising from the unique scenic or aesthetic qualities of the resource.

[¶ 19] Section 480–D(1) also requires that scenic and aesthetic uses be "existing" in order to be protected. The definition of "exist" is "[t]o have ... actuality." *Id.* at 475. The term "existing" establishes that the scenic and aesthetic uses of a protected natural resource do not include theoretical uses; rather, the term "existing" limits scenic and aesthetic uses to those activities that are extant at the time a permit application is submitted.

[¶ 20] "Scenic," as it relates to the natural environment, describes the features of a landscape. *See id.* at 1097. "Aesthetic," as it relates to the natural environment, describes objects or areas of visual beauty within that environment. *See id.* at 83. As used in section 480–D(1), "scenic" and "aesthetic" qualify "uses." Consequently, section 480–D(1) does not require applicants to identify everything that may be "scenic" or "aesthetic" within a particular resource, but rather directs applicants to identify the scenic or aesthetic "uses" within the resource that are protected by section 480–D(1). Ultimately, it is the "existing uses" within a resource that are protected by section 480–D(1) from unreasonable interference, and not everything within the resource that may be considered scenic or aesthetic.

c. "Unreasonably Interfere"

[¶ 21] To "interfere" means to "come between so as to be a hindrance." *Id.* at 669. "Reasonableness is a well defined concept under the common law." *Town of Baldwin,* 2002 ME 52, ¶ 13, 794 A.2d at 68 (quotation marks omitted). As such, statutes prohibiting activities that have unreasonable effects are generally not unconstitutionally vague. *See id.* Indeed, in *In re Spring Valley Development,* 300 A.2d 736, 739, 749–53 (Me.1973), a case quite similar to this, we upheld the constitutionality of the Site Location of Development Law, currently codified at 38 M.R.S. §§ 481–490 (2008), in the face of a void for vagueness and unlawful delegation challenge. Our analysis centered on the law's regulation of "unreasonable effect[s] upon existing uses":

> The requirement that the Commission must be satisfied that there will be no adverse effect upon the natural environment is the very substance of the Legislature's efforts to reduce despoilation of the environment to a minimum. While most such developments may be expected to "affect" the environment adversely to the extent that they add to the demands already made upon it, it is the *unreasonable* effect upon existing uses, scenic character and natural resources which the Legislature seeks to avoid by empowering the Commission to measure the nature and extent of the proposed use against the environment's capacity to tolerate the use.

*In re Spring Valley Dev.,* 300 A.2d at 751 (emphasis in original).

[¶ 22] *In re Spring Valley Development* underscores that a reasonableness determination is a fact-specific inquiry. *See also United States v. Banks,* 540 U.S. 31, 36, 124 S.Ct. 521, 157 L.Ed.2d 343 (2003) ("[W]e have treated reasonableness as a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of circumstances in a given case...."). We recognized the same with respect to section 480–D(1) in *Uliano I* when we concluded that it was improper for the Board to treat its practicable alternative analysis as determinative, and that it must instead consider the practicable alternatives as part of determining reasonableness: "Whether a proposed project's interference with existing uses is reasonable depends on a multiplicity of factors, one of which is the existence of a practicable alternative. A balancing analysis inheres in any reasonableness inquiry." 2005 ME 88, ¶ 13, 876 A.2d at 19.

 [¶ 23] Consequently, whether a proposed activity will unreasonably interfere with an existing scenic or aesthetic use will necessarily depend on the specific circumstances of a given case. In *Kroeger,* for instance, we affirmed the Department's finding that a proposed dock would unreasonably interfere with the scenic and aesthetic uses based on the specific scenic uses made of Somes Sound by "the boaters and hikers who flock to Acadia for the scenic beauty of the area." 2005 ME 50, ¶ 16, 870 A.2d at 571. Given the factual nature of the reasonableness inquiry, it is the applicant's burden to establish facts that "demonstrate[ ] that the proposed activity meets the standard[ ] set forth in [section 480–D(1)]." 38 M.R.S. § 480–D. As illustrated by *Kroeger,* an applicant may be aided by expert testimony in meet-

ing this burden. *See* 2005 ME 50, ¶¶ 11–13, 870 A.2d at 570 (evidence on unreasonable interference included "the experts' reports on existing scenic uses and the visual impact of the proposed dock"). There was no expert testimony offered by the Ulianos on this issue in this case.

d. Quantitative Standards

[¶ 24] The Ulianos specifically contend that the scenic and aesthetic uses standard is unduly vague because it is completely lacking in quantitative standards, citing, in particular, our decision in *Kosalka v. Town of Georgetown,* 2000 ME 106, 752 A.2d 183. In *Kosalka,* we held that a municipal zoning ordinance that required an applicant to demonstrate that a proposed project would "conserve natural beauty" was an unconstitutional delegation because the standard was an "unmeasurable quality, totally lacking in cognizable, quantitative standards." 2000 ME 106, ¶ 17, 752 A.2d at 187. *Kosalka* is in accord with a line of decisions that have held, "in the conditional use context[,] that 'in order to withstand attack as an impermissible legislative delegation of authority, ordinances that establish criteria for acceptance of a conditional use must specify sufficient reasons why such a use may be denied.'" *Id.* ¶ 12, 752 A.2d at 186 (quoting *Gorham v. Town of Cape Elizabeth,* 625 A.2d 898, 900 (Me.1993)). *See also Wakelin v. Town of Yarmouth,* 523 A.2d 575, 577 (Me.1987) (holding the terms "intensity of use" and "density of development" not sufficiently quantifiable); *Cope v. Inhabitants of the Town of Brunswick,* 464 A.2d 223, 227 (Me.1983) (whether a use would comply with the "health, safety and welfare of the public and the essential character of the area" was a "legislative question"); *Stucki v. Plavin,* 291 A.2d 508, 511 (Me.1972) (ordinance authorizing zoning board to approve a use provided the use "shall meet the approval" of the board failed to prescribe sufficient stan-

dards); *Waterville Hotel Corp. v. Bd. of Zoning Appeals*, 241 A.2d 50, 52 (Me.1968) ("subject to the approval of the Board of Zoning Appeals" was not "limited by legislative standards").

[¶ 25] Section 480–D(1)'s scenic and aesthetic uses standard is distinguishable from the municipal ordinances whose terms we have found unconstitutionally vague due to their failure to provide cognizable, quantitative standards. First and foremost, unlike the terms in section 480–D(1), which are susceptible to a logical construction as discussed above, the standards at issue in the *Kosalka* line of cases were wholly subjective and permitted municipal employees or board members to make "legislative-type decisions based on any factor they independently deem[ed] appropriate." *Kosalka*, 2000 ME 106, ¶ 16, 752 A.2d at 187. Identifying an existing scenic or aesthetic use for purposes of section 480–D(1) and determining whether a proposed activity will unreasonably interfere with those uses is a far more concrete exercise than the amorphous command we considered in *Kosalka* requiring an applicant to prove that a project will "conserve natural beauty."

[¶ 26] Second, the *Kosalka* line of cases involved delegations of relatively boundless discretion by municipal ordinances. We have long distinguished such delegations of authority from those established by acts of the Legislature. *See Lewis*, 433 A.2d at 748. Unlike a municipal delegation of authority to a town zoning board, the State's delegation of authority to an executive agency, the Board of Environmental Protection, to administer section 480–D(1) and other provisions of NRPA is subject to the Maine Administrative Procedure Act and its procedural protections. *See* 5 M.R.S. §§ 8001–11008 (2008); 38 M.R.S. § 341–D (2008). We have previously recognized that "in such cases in which the statutory enactment of detailed specific standards is impossible, the presence of adequate procedural safeguards to protect against an abuse of discretion by the administrators of the law[ ] compensates substantially for the want of precise legislative guidelines and may be taken into consideration in resolving the constitutionality of the delegation of power." *Finks v. Me. State Highway Comm'n*, 328 A.2d 791, 796 (Me. 1974).

[¶ 27] Unlike the municipal ordinances considered in the *Kosalka* line of cases, NRPA not only involves a delegation of authority by the legislative branch to the executive branch to regulate uses that do not lend themselves to precise guidelines, but also subjects the delegated authority to the procedural protections of the Maine Administrative Procedure Act. The procedural history of the Ulianos' application demonstrates the high degree of scrutiny that can result from this approach.

[¶ 28] Third, pursuant to 38 M.R.S. § 341–D(1–B), the Board is required to promulgate rules, subject to the Maine Administrative Procedure Act, that are "necessary for the interpretation, implementation and enforcement of any provision of law that the department is charged with administering." As the rules promulgated by the Board are themselves subject to the Maine Administrative Procedure Act, they are subject to public notice, modification, and judicial review. *See Ne. Occupational Exch., Inc. v. State*, 540 A.2d 1115, 1117 (Me.1988). Consequently, by providing significant protection against abuses of discretion by the Board in exercising its rule-making authority, the requirement that the Board promulgate rules subject to the Maine Administrative Procedure Act compensates "substantially for the want of precise [legislative] guide-

lines." *Id.* (quotation marks omitted).[4] This requirement stands in contrast to the municipal delegations considered in the *Kosalka* line of decisions, in which municipal board members were not authorized or presumed to have the expertise necessary to formulate an interpretation of the delegated authority through a rulemaking process, but were instead left to "decide . . . legislative question[s] anew." *Cope,* 464 A.2d at 227.[5]

#### e. Conclusion

[¶ 29] Unlike Shakespearean notions consigning beauty to the eye of the beholder,[6] the concept of scenic and aesthetic uses within a particular natural resource is, when viewed through the lens of modern sensibilities, sufficiently definite so that such uses can, in any given case, be reliably identified based on competent proof. The same is true as to the determination of whether, under all relevant circumstances, a proposed activity will unreasonably interfere with the uses. The fact-finding required to give effect to NRPA's protection of existing scenic and aesthetic uses is no more imprecise or speculative than the fact-finding required to determine the best interests of a child in a custody proceeding or the mental state of a criminal defendant in a criminal prosecution.

[¶ 30] The standard is also not constitutionally deficient simply because it is not couched in empirical terms. Although scenic and aesthetic uses are not readily susceptible to quantitative analysis, the Constitution does not demand such an analysis in order to subject those uses to legal protection.[7] We have previously rec-

---

4. Indeed, in *Conservation Law Foundation, Inc. v. Department of Environmental Protection,* 2003 ME 62, ¶ 31, 823 A.2d 551, 561, we treated section 480–D(1)'s existing uses criterion as sufficiently definite to enable the Board to promulgate standards providing for permits by rule.

5. In fact, the Board has promulgated regulations that implement and expand upon section 480–D(1)'s scenic and aesthetic uses standard. *See* 2 C.M.R. 06 096 315 (2003). The regulations provide detailed factors for evaluating whether a proposed activity will unreasonably interfere with existing scenic and aesthetic uses. For example, in addition to evaluating the "visual elements of the landscape," which include "landscape compatibility," "scale contrast," and "spatial dominance," the Board considers:

 the type, area, and intransience of an activity related to a scenic resource that will be affected by the [applicant's proposed] activity, the significance of the scenic resource, and the degree to which the use or viewer expectations of a scenic resource will be altered, including alteration beyond the physical boundaries of the activity.

 *Id.* at 315–3 § 9. The regulations further provide that "scenic resources" include, but are not limited to, "locations of national, State, or local scenic significance." *Id.* at

315–4 § 10. A scenic resource with national or statewide significance is one "visited by large numbers who come from across the country or state." *Id.* A scenic resource of local significance is one "visited primarily by people of local origin." *Id.* Thus, the Board's regulations provide significant instruction on how to both interpret and implement section 480–D(1)'s scenic and aesthetic uses standard. The Ulianos do not raise any issues concerning the Board's adoption of the regulations, or the applicability of the regulations to their application.

6. *See* William Shakespeare, Love's Labour's Lost 31 (Richard David ed., London: Methuen 1956) (1598).

7. Thus, it is established that aesthetic interests are sufficiently real and definite to confer legal standing to sue. In *Summers v. Earth Island Institute,* —— U.S. ——, ——, 129 S.Ct. 1142, 1149, 173 L.Ed.2d 1 (2009), for example, the Supreme Court concluded that a concrete injury can arise if the harm of a proposed activity "in fact affects the recreational or even the mere esthetic interests of the plaintiff." Similarly, "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by

ognized that "[o]bjective quantification, mathematical certainty, and absolute precision are not required by either the United States Constitution or Maine Constitution." *Town of Baldwin,* 2002 ME 52, ¶ 7 n. 2, 794 A.2d at 66; *see also Davis v. Sec'y of State,* 577 A.2d 338, 341 (Me.1990). In delegating decision-making authority to an executive agency, a statute need not provide determinate criteria as long as it offers "an intelligible principle to which the person or body authorized to act is directed to conform." *Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 472, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) (quotation marks omitted). Thus, in *Whitman,* the Court held that a statute requiring the Environmental Protection Agency to set ambient air quality standards "requisite to protect the public health" was not a vague delegation of authority because "requisite" meant "not lower or higher than is necessary." *Id.* at 475–76, 121 S.Ct. 903.

[¶ 31] Every state, Maine included, has a substantial interest in the preservation of its unique scenic and aesthetic qualities. Thus, in *Brophy v. Town of Castine,* 534 A.2d 663, 664 (Me.1987), a town's set-back requirement relative to the water's edge was found to be a valid exercise of the police power because it "reasonably promotes the town's interest in preserving, for the public's aesthetic welfare, those areas from development." NRPA's protection of scenic and aesthetic uses is a similar exercise of the police power. It rests on the Legislature's finding that "the cumulative effect of frequent minor alterations and occasional major alterations of [protected

natural resources] poses a substantial threat to the environment and economy of the State and its quality of life." 38 M.R.S. § 480–A. We have no reason to question this legislative finding. As such, NRPA's protection of scenic and aesthetic uses serves a significant governmental interest and is a valid exercise of the police power.

[¶ 32] The operative terms contained in section 480–D(1) render the statute susceptible to a logical construction that provides meaningful guidance to both permit applicants and those who are duty-bound to administer it. The statute's regulation of scenic and aesthetic uses does not render it unconstitutionally vague and does not result in an unconstitutional delegation of legislative authority.

2. The Section 480–D(1) Analysis

■■■ [¶ 33] The Ulianos contend that the administrative record does not support the Board's conclusion that the proposed pier will unreasonably interfere with existing scenic and aesthetic uses. Specifically, they assert that the Board failed to explain the significance of the natural resource at issue and that the natural resource must be of special significance to justify the denial of their permit. They further assert that the Board mischaracterized the shoreline as "relatively undisturbed and unobstructed," and contend that the shoreline is substantially developed based on the presence of four existing piers and numerous structures, particularly stairways. Finally, they contend that the Board erred by distinguishing two of the four alleged

the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, 183, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (quotation marks omitted). *See also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 562–63, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ("Of course, the desire to use or observe an animal species, even for purely esth-

etic purposes, is undeniably a cognizable interest for purpose of standing."); *Minn. Pub. Interest Research Group v. Butz,* 358 F.Supp. 584, 595 (D.Minn.1973) ("The scenic use is self-explanatory. The rustic, natural scenery of the [Boundary Waters Canoe Area] is one of the main reasons for its heavy recreational use.").

piers as "grandfathered" piers, and that section 480–D(1) does not permit the Board to distinguish between piers that are "grandfathered" and those that are not.

[¶ 34] Contrary to the Ulianos' first assertion, although the Board must consider the significance of the natural resource, it is not required by statute or rule to expressly find that the resource is an area of special significance in order to deny a permit. As a coastal wetland, the shoreline at issue has already been designated as a "resource[ ] of state significance" having "great scenic beauty and unique characteristics," 38 M.R.S. § 480–A, and the Department has already determined that "[a]ll coastal wetlands ... are considered wetlands of special significance," 2 C.M.R. 06 096 310–3 § 4 (2007). As the Legislature and the Department have already found coastal wetlands to be of special significance, the Board is not required to make an explicit finding that the shoreline is particularly significant before denying the Ulianos' permit.[8]

[¶ 35] The Ulianos' additional reliance on *Kroeger* for the proposition that the Board was required to make an express finding of special significance is misplaced. The Ulianos contend that, in *Kroeger*, the Department found that Somes Sound was a significant natural resource that justified the denial of a pier permit, and that the Board must make a similar finding here before denying their permit. Although in *Kroeger* the Department noted that the proposed pier was located in "the only natural fjord on the east coast of the United States," 2005 ME 50, ¶ 10, 870 A.2d at 569–70 (quotation marks omitted), this fact was not dispositive. Rather, the location of the proposed pier in Somes Sound was one of several factors leading to the Department's conclusion that the proposed pier would unreasonably interfere with existing scenic and aesthetic uses. *See id.* ¶¶ 10–14, 870 A.2d at 569–570; *see also Uliano I*, 2005 ME 88, ¶ 24, 876 A.2d at 22 (noting that in *Kroeger* the Department considered the significance of Somes Sound in considering the uses of the natural resource).

[¶ 36] Contrary to the Ulianos' next assertion, the Board did not lack evidentiary support for its characterization of the shoreline as "relatively undisturbed and unobstructed." The Ulianos misapprehend the record in arguing that the shoreline between Hadley Point and Parker Point contains four piers. As evidence for their position, the Ulianos cite to the Department's original order from 2001 approving the Ulianos' permit. However, the record developed after the Department's original order supports the Board's finding that there was "undisputed evidence that the only existing piers between Parker Point and Hadley Point are two grandfathered piers located in Emery Cove ... [and an] older walkway structure." In particular, the evidence supports the Board's finding that the two piers cited by the Ulianos, the "Milliken/Northern Lights" and "Moya" piers, are both located east of Parker Point in Frenchman's Bay.

[¶ 37] Moreover, the Ulianos' contention that evidence of stairways along the shore compels a finding that the shoreline

---

8. Indeed, in addressing a different issue in their brief, the Ulianos concede that the Board has no authority to find that a particular coastal wetland has a special significance that makes it more deserving of protection than other coastal wetlands: "One problem with this statement is that *all* coastal wetlands are considered wetlands of special significance.... So, that means the Board cannot simply designate one coastal wetland as deserving of more protection than another."

is developed is inapt. The Board found that the "[a]ccess to the coastal wetland in this area is achieved primarily by individual walkways, paths or stairways to the beach." Although the interveners testified that the number of stairways had grown over the years, and that these structures were not ideal, their testimony did not suggest that these structures unreasonably interfere with the scenic and aesthetic uses of the shoreline, nor did other evidence establish this point. Rather, the evidence supported the Board's finding that because the primary access to the shoreline was achieved through stairways and walkways rather than piers, the Ulianos' proposed pier would "dominate the landscape" such that it would unreasonably interfere with the scenic and aesthetic uses of the shoreline. Such evidence included testimony that the Ulianos could not see any piers along Eastern Bay from their project site, that the Ulianos' pier would be the first individual recreational pier within Eastern Bay, and that the two piers in Emery Cove were "tucked" away and not visible from the rest of Eastern Bay.

[¶ 38] Regarding the Ulianos' final assertion, the Board did not attach significant meaning to the term "grandfathered" in describing the two existing piers located in Emery Cove. The Board's finding that the shoreline was "relatively undisturbed and unobstructed" was conditioned on evidence showing that there was an absence of piers in the vicinity, not on evidence showing that the Board ignored the presence of piers due to their designation as grandfathered piers. As the Board suggests in its brief, the term "grandfathered" is a shorthand, though technically imprecise reference that the two piers were built prior to the enactment of NRPA. There is no error in the Board's use of the term in this manner.

## B. Practicable Alternatives

### 1. The Performance of the Practicable Alternatives Analysis

[¶ 39] The Ulianos contend that the Board erred by performing the practicable alternatives analysis required by section 5(A) of the Wetland Protection Rules before determining the degree of interference with existing uses pursuant to section 480–D(1). Section 5(A) of the Wetland Protection Rules provides that "[n]o activity shall be permitted if there is a practicable alternative to the project that would be less damaging to the environment." 2 C.M.R. 06 096 310–3 § 5(A) (2007).

[¶ 40] In our previous decision in this case, we stated that "the Board's consideration of practicable alternatives to a proposed project is a factor that should be balanced in its section 480–D(1) analysis." *Uliano I*, 2005 ME 88, ¶ 13, 876 A.2d at 19–20. This statement addressed the Board's error of failing to "relate its finding that a practicable alternative exists to its overall determination of whether the relevant section 480–D criteria were satisfied." *Id.* ¶ 11, 876 A.2d at 19. It did not simultaneously announce a specific methodology by which the Board must perform the balancing analysis. Therefore, the Board did not err by addressing the existence of practicable alternatives in its order before discussing the degree of impact on existing uses.

[¶ 41] Furthermore, contrary to the Ulianos' assertion, the Board did determine the degree of impact on existing uses. In its section 480–D(1) analysis, the Board specifically found that the Ulianos' proposed pier would be a "significant visual intrusion" for persons walking the intertidal area, and that the pier would have a "significant adverse scenic and aesthetic impact on the uses of the area by boaters." Having found that the degree of impact on those existing scenic and aesthetic uses

would be significant, the Board then found that the degree of impact would be unreasonable because, among other reasons, "the applicants do have at least one practicable alternative that would be less damaging to the environment." The Board's analysis therefore properly determined the degree of impact on existing uses, and further related its finding that a practicable alternative exists to its determination of whether the section 480–D(1) criteria were satisfied.

### 2. The Evidence Supporting the Practicable Alternatives Analysis

■ [¶ 42] The Ulianos assert that the record does not support the Board's practicable alternatives analysis for a variety of reasons. They contend that the Board: (1) inaccurately described the shoreline relevant to the practicable alternatives analysis by including the shoreline of the abutting property belonging to Rosecliff Cottages; (2) erred by relying on evidence that neighbors used dinghies and outhaul systems on their own properties to conclude that such a system was a practicable alternative on the Ulianos' property; (3) erred by finding that a dinghy and outhaul system had previously been used on the Ulianos' property; (4) failed to acknowledge that the bottom stairs on the eastern shoreline of their property are inundated at high tide and unsafe to use; and (5) erred by finding that the use of a yacht club three miles away was a practicable alternative.

[¶ 43] Contrary to the Ulianos' first assertion, the Board did not err in describing the relevant shoreline applicable to the practicable alternatives analysis. Although the Board noted that the Ulianos "own two adjoining parcels," it concluded that "[t]he proposed project would be located on the parcel associated with the primary residence and having 215 feet of shore frontage." The Board did not expand its practicable alternatives analysis to consider the existence of a practicable alternative for the Ulianos on the Rosecliff Cottages property or on any other stretch of shoreline. Indeed, the Board found that a practicable alternative existed specifically because the eastern shoreline of the Ulianos' parcel associated with their residence permitted the use of an outhaul system.

[¶ 44] The Board also did not err by finding that the use of outhaul systems by neighbors was relevant to the existence of a practicable alternative. Had the Board concluded that an outhaul system was a practicable alternative based solely on evidence that neighbors used such a system on their own properties, it is likely that the Board's finding would be inadequate. However, the Board also found that there was unrefuted testimony that an outhaul system had been used previously on the Ulianos' property. Taken together, the evidence of use of outhaul systems by both neighbors and the Ulianos' predecessor support the Board's finding that the use of such a system was not only practicable, but practicable on the Ulianos' particular property.

[¶ 45] In their third assertion, the Ulianos misapprehend the record evidence in contending that it is "simply untrue" that the Ulianos' predecessor used an outhaul system. In its decision, the Board stated that "[t]here was also testimony, which was not refuted, that such a system has been used at the applicants' property in the past." The Ulianos attribute this testimony to Marty Lamson, who spoke on behalf of the Ulianos at the Board's hearing. The substance of Lamson's testimony was that he owned property behind the Ulianos, and that with permission from the Ulianos' predecessor he had used an outhaul system for "two or three years" from a

set of stairs on the Rosecliff Cottages parcel, but had given up as it was difficult, his children had lost interest in sailing, and his business was busy. The Board accounted for Lamson's testimony in its decision by stating that "[t]wo persons testified ... that they have used a dinghy to access a mooring at or in the vicinity of the project site, but that it was difficult ... [and] that they no longer maintain a boat ... [because of their] family's loss of interest in sailing and business time commitments."

[¶ 46] In fact, the unrefuted testimony that the Board identified was that of Phoebe Boyer, an intervener, who testified that the previous owner of the Ulianos' property "kept [a dinghy] at the steps that are on the—near the Sand Point Association property line." The Board's finding that the Ulianos could maintain an outhaul system from the existing stairway on "the shoreline at the eastern end of the applicants' lot, adjacent to the Sand Point Association Common Lot" is consistent with and supported by Boyer's testimony.

[¶ 47] Contrary to the Ulianos' fourth assertion, although the Board could have credited the Ulianos' testimony that the bottom steps of the stairs on their eastern shoreline are inundated at high tide and therefore too dangerous to use a dinghy and an outhaul, the Board was not required to do so. *See Preston v. Tracy,* 2008 ME 34, ¶ 11, 942 A.2d 718, 720. The Board found that evidence of "numerous small boats, including kayaks, canoes and dinghies, stored along the shoreline and the presence of outhaul lines and moorings substantiat[ed] testimony that this is a common method of accessing ... boats throughout Eastern Bay," and further found that the Ulianos' predecessor had maintained a dinghy at the steps of the eastern shoreline. The Board did not err in crediting this evidence.

[¶ 48] Finally, the Board's finding that the use of a yacht club three miles away was a practicable alternative is supported by the record. The Board was presented with evidence showing that the yacht club was actively seeking new members and that it could provide deep-water access to a boat at all tides. *See Kroeger,* 2005 ME 50, ¶ 20, 870 A.2d at 572.

## C. The Right to Wharf Out

[¶ 49] The Ulianos contend that the Board's denial of their permit application eliminates their common law right to wharf out from their property and therefore constitutes an unreasonable regulation of their right to wharf out.

[¶ 50] Subject to reasonable regulation, common law provides a riparian landowner the right to wharf out to the navigable portion of an abutting body of water. *Great Cove Boat Club v. Bureau of Pub. Lands,* 672 A.2d 91, 95 (Me.1996); *see also Britton v. Dep't of Conservation,* 2009 ME 60, ¶¶ 15, 22, 974 A.2d 303, 308, 309. Reasonable regulation of the common law right to wharf out includes the requirement that a riparian landowner acquire a permit before constructing a wharf. *Great Cove,* 672 A.2d at 95.

[¶ 51] Given that the acquisition of a permit prior to the construction of a pier is a reasonable regulation of the common law right to wharf out, the Board's denial of the Ulianos' application does not constitute an unreasonable regulation of their right to wharf out from their property. *See Hannum v. Bd. of Envtl. Prot.,* 2006 ME 51, ¶ 26 n. 4, 898 A.2d 392, 402. The right to wharf out is not an unconditional right.

The entry is:

Judgment affirmed.

ALEXANDER, J., dissenting.

[¶ 52] I respectfully dissent.

[¶ 53] The Court's action today licenses the Board of Environmental Protection (Board) to invoke the unreasonable interference with scenic or aesthetic uses standard in 38 M.R.S. § 480–D(1) (2008), to approve or reject proposed shorefront improvements solely on the basis of whether the Board, or project opponents, like the looks of the project or not. As is often said: "Beauty is in the eye of the beholder." Because standards of beauty or aesthetics are essentially personal and unquantifiable, our constitutional due process standards do not permit the approval or disapproval of applications to be based on vague standards such as beauty or aesthetics that can be arbitrarily and capriciously applied without giving any guidance as to what is necessary for approval or disapproval.

[¶ 54] The Board's support for its rejection of the Ulianos' proposed dock is stated across ten single-spaced pages of rambling and obscure reasoning. In its order, the Board concludes that the dock "would have a significant adverse impact on the scenic and aesthetic value of the wetland" and "on the uses of the area by boaters in Eastern Bay and, in particular, kayakers and small boat users who frequent the near shore area." The Board appears to justify rejecting the application by noting that "the proposed pier would be in a viewshed that is not extensively developed." The Board did not define "viewshed" for us, but it appears to mean what you can see from somewhere else— particularly a nearby, private club whose members led the opposition to the Ulianos' project. Thus, the Board observes that

"[t]he visual impact of the proposed project on boaters in Eastern Bay would diminish with increased distance, but the pier would continue to be visible at many points throughout the Bay especially when reflecting the sunlight."

[¶ 55] The Board seems to conclude that since others, particularly "beach combers," "boaters," "kayak groups," and members of the nearby private club, could see the Ulianos' proposed pier, and it would represent an alteration of their "viewshed," the proposal would unreasonably interfere with existing scenic and aesthetic uses.[9] If this proposal can be rejected on this basis, then any alteration of any existing shorefront, lakefront or riverfront can be similarly rejected. Most areas with such waterfronts have their own unique natural beauty. None of the language in 38 M.R.S. § 480–D(1), the Board's regulations, or the Board's order provides any hint of what an applicant could present to win approval of a change in the waterfront once neighbors or water users object that the project might change their "viewshed" in some way.

[¶ 56] We have held repeatedly that findings in administrative orders, when required by law, must be sufficiently specific to permit understanding and meaningful appellate review. *Schwartz v. Unemployment Ins. Comm'n*, 2006 ME 41, ¶ 10, 895 A.2d 965, 970; *Hannum v. Bd. of Envtl. Prot.*, 2003 ME 123, ¶ 12, 832 A.2d 765, 769. *See also* 5 M.R.S. § 9061 (2008); 1 M.R.S. § 407(1) (2008). In fact, we said the same thing in our previous remand of this case. *Uliano v. Bd. of Envtl. Prot. (Uliano I)*, 2005 ME 88, ¶¶ 23–25, 876 A.2d 16, 21–22.

---

9. Significantly, the Board found that the proposed pier would not interfere with actual existing uses such as launching boats from the nearby private club, walking on any existing beach, or boating in the bay. The Board indicated that area where the proposed pier would be constructed was a steep, rocky embankment.

[¶ 57] Despite our direction in the prior remand, the Superior Court found that the Board's rambling narrative did not permit meaningful appellate review.

It is clear that the Board's "findings" are done in a narrative format that does not make for meaningful appellate review in accordance with the direction of the Law Court in its 2005 review of this matter [*citing Uliano I*].

[¶ 58] If our prior precedent is to be respected, that finding alone should require a remand for clear findings that facilitate meaningful appellate review. As the trial court found, when an administrative agency "fails to make sufficient and clear findings of fact and such findings are necessary to judicial review, we will remand the matter to the agency or board to make the findings." *Carroll v. Town of Rockport,* 2003 ME 135, ¶ 30, 837 A.2d 148, 157; *see also Christian Fellowship & Renewal Ctr. v. Town of Limington,* 2001 ME 16, ¶¶ 11–19, 769 A.2d 834, 838–41. Sufficient, clear findings are particularly important if an agency acts pursuant to a vague standard that is difficult to quantify.

[¶ 59] In *Kosalka v. Town of Georgetown,* 2000 ME 106, 752 A.2d 183, we held that an ordinance that required a project applicant to show that a project would "conserve natural beauty" was unconstitutionally vague and violative of due process standards. That standard, like the scenic and aesthetic uses standard here, provided little direction as to what was required for project approval and invited rejection of applications based on nothing more objec-

tive than the reviewer's sense of "beauty." In *Kosalka,* we cautioned land use regulatory agencies that individuals seeking to make improvements to their property "are entitled to know with reasonable clarity what they must do under state or local land use control laws to obtain the permits or approvals they seek." *Id.* ¶ 12, 752 A.2d at 186.

[¶ 60] Prior to *Kosalka,* we had struck down an ordinance reliant on a "compatible with existing uses" standard as failing "to articulate the quantitative standards necessary to transform the unmeasured qualities . . . into specific criteria objectively usable by both the Board and the applicant. . . ." *Wakelin v. Town of Yarmouth,* 523 A.2d 575, 577 (Me.1987). *See also Cope v. Town of Brunswick,* 464 A.2d 223, 225 (Me.1983) (ordinance void for vagueness that allowed denial of application upon determination that use would "adversely affect the health, safety or general welfare of the public," or would "alter the essential characteristics of the surrounding property"); *Waterville Hotel Corp. v. Bd. of Zoning Appeals,* 241 A.2d 50, 52–54 (Me.1968) (ordinance void for vagueness that allowed denial of application upon determination that use would be "detrimental to the neighborhood").

[¶ 61] As we noted in *Kosalka,* a land use control, to pass the due process test, must answer two questions: (1) "what must an applicant do to obtain a permit," and (2) "under what set of facts should the [Board] grant or deny the application." 2000 ME 106, ¶ 16, 752 A.2d at 187.[10]

10. The Court's opinion attempts to minimize *Kosalka* and the other opinions in which we have decided that land use control regulations were void for vagueness, suggesting that due process requires more rigorous review of municipal regulations than of State regulations. The Court suggests, therefore, that terms viewed as void for vagueness when appearing in municipal regulations can be viewed as sufficiently specific when appearing in State regulations. This fanciful position is perhaps necessary to allow the Court to distinguish our prior opinions that have found terms very similar to the terms at issue here void for vagueness. But this position is utterly lacking in support in application of our constitutional, due process standards that apply equally to the State and municipalities.

[¶ 62] The Board's findings applied to Uliano's application do not suggest answers to either of these questions. Whether something unreasonably interferes with existing scenic and aesthetic uses or alters someone's "viewshed" are questions that can be answered only in the eyes of the beholder. That standard and its application by the Board offer no "quantitative standards necessary to transform the unmeasured qualities ... into specific criteria objectively usable by both the Board and the applicant...." *Wakelin*, 523 A.2d at 577. As every pier, every development, will have some scenic and aesthetic impact, any pier or other alteration of someone's "viewshed" can be approved or disapproved purely on the whim of the reviewer, without any objective criteria to guide the applicant, appellate reviewers, or future applicants.

[¶ 63] The Board's order is also ambiguous in its treatment of the "reasonable alternative" requirement. The order appears to apply the reasonable alternative requirement to the application only because the application fails the scenic and aesthetic test in the eyes of the Board beholders. If so, then the invalidity of the scenic and aesthetic test ends the necessity to consider reasonable alternatives. If the reasonable alternative requirement is an independent requirement, then it too has vagueness problems. However, because the scenic and aesthetic uses issue must be resolved in the Ulianos' favor, fairness requires that the reasonable alternatives issue be reexamined in light of the changed outcome on the dominant scenic and aesthetic uses issue.

[¶ 64] I would vacate the Superior Court's judgment and remand to the Superior Court for further remand to the Board of Environmental Protection with direction to: (1) determine that the scenic and aesthetic uses standards applied to deny the Ulianos' application are void for vagueness and inapplicable to the Ulianos' application, and (2) reconsider the reasonable alternatives issue in light of the determination that the scenic and aesthetic uses criteria are not enforceable and must not be considered in any way in determining the need, if any, to consider any reasonable alternative.