MAINE SUPREME JUDICIAL COURT                           Reporter of Decisions
Decision:    2013 ME 25
Docket:      BEP-12-137
Argued:      November 8, 2012
Decided:     March 5, 2013

Panel:       SAUFLEY, C.J., and LEVY, <u>SILVER</u>, MEAD, GORMAN, and JABAR, JJ.[*]

# FRIENDS OF MAINE'S MOUNTAINS et al.

v.

# BOARD OF ENVIRONMENTAL PROTECTION et al.

SILVER, J.

[¶1]  Friends of Maine's Mountains, Friends of Saddleback Mountain, and several individuals[1] (collectively, Friends) appeal from a final order of the Board of Environmental Protection.  The Board affirmed the Department of Environmental Protection's order approving the application of Saddleback Ridge Wind, LLC (Saddleback), for a permit to construct the Saddleback Ridge Wind Project.

[¶2]  Friends argues that the Board abused its discretion when determining which nighttime sound level limit to apply to the applications.  Friends also makes three constitutional arguments:  (1) that the Maine Wind Energy Act, 35-A M.R.S.

_____

[*] Alexander, J., sat at oral argument but did not participate in the development of the opinion.

[1] The record is unclear about which specific individuals are appealing to this Court.  The parties that appealed the Department's decision to the Board, however, included several individuals who own properties that are located near the project site and were used in the Noise Impact Study.

§§ 3401-3458 (2012)[2], denies Friends equal protection by denying protection for lakes not rated for scenic resources in the *Maine's Finest Lakes Study* (*MFL Study*); (2) that the Wind Energy Act violates the Separation of Powers Clause of the Maine Constitution by having overly vague criteria for assessing visual impact pursuant to 35-A M.R.S. § 3452(3); and (3) that the Department and Board demonstrated bias, thus violating Friends's due process rights. We vacate the Board's order related to nighttime sound requirements and remand for further proceedings.

## I. BACKGROUND AND PROCEDURE

[¶3] On October 26, 2010, Saddleback filed with the Department applications pursuant to the Site Location of Development Law and the Natural Resource Protection Act, seeking a permit to build a wind energy development in the Towns of Carthage, Canton, and Dixfield. The applications described the development as a "12-turbine, 33 [megawatt] wind energy project and associated transmission line and substation." The applications included a noise impact study and a visual impact assessment, which the Department hired consultants to review as part of its application review. The visual impact assessment evaluated the effect of the project on "scenic resource[s] of state or national significance," 35-A M.R.S.

---

[2] The Maine Wind Energy Act, 35-A M.R.S. §§ 3401-3458 (2012), was amended in 2011, but the amendments do not impact this opinion. P.L. 2011, ch. 655 (Apr. 24, 2012); P.L. 2011, ch. 682 (Aug. 30, 2012).

§ 3451(9), that are located near the project. It did not assess the visual impact on Webb Lake, which is located near the project, because the lake is not classified as a "scenic resource of state or national significance." The noise impact study assessed the effect of the noise from the project on the thirty-four residences located near the project.

[¶4] Friends objected to the permit application, attaching exhibits including extensive scientific literature on the health effects of the noise emitted by wind turbines, and requested that the Department hold a public hearing. The Department reviewed the material, and the acting commissioner for the Department issued a letter denying the hearing request.

[¶5] In response to the public interest in the project, the Department held a public meeting, pursuant to 38 M.R.S. § 345-A(5) (2012), in the Town of Dixfield. During the meeting, many individuals shared their concerns about the project. Apart from the meeting, the Department also received comments, articles, and petitions from individuals and organizations both for and against the project. As part of its opposition to the project, Friends commissioned a report that found that Webb Lake fulfilled "the definitions for the label 'significant' or 'outstanding' as they relate to scenic quality and shoreline character" as assessed in the *MFL Study*.

[¶6] In its final order, issued by the acting commissioner on October 6, 2011, the Department approved the application subject to certain

4

conditions. Although only the Department has jurisdiction to grant wind energy applications, 38 M.R.S. § 341-D(2) (2012) (removing jurisdiction from the Board for expedited wind energy developments); 35-A M.R.S. § 3451(8)(A) (defining the Department as the primary siting authority for expedited wind energy developments), the Board[3] conducts appellate review of the Department's expedited wind energy development decisions, 38 M.R.S. § 341-D(4)(D) (2012). On appeal, the Board has the authority to "affirm, amend, reverse or remand to the commissioner for further proceedings . . . permit decisions regarding an expedited wind energy development." *Id.* The Board is also tasked with responsibility for "major substantive rulemaking, decisions on selected permit applications . . . and recommending changes in the law to the Legislature." 38 M.R.S. § 341-B (2012) (stating the purpose of the Board).

[¶7] Friends appealed the Department's order to the Board. On appeal, Friends requested "a public hearing before an impartial hearing officer" to assist the Board in understanding the conflicting technical evidence. *See* 38 M.R.S. § 345-A(1-A) (2012) (permitting public hearings at the discretion of the Board). Friends also challenged the Department's order regarding its findings on noise, visual impact, and tangible benefit payments. The Board issued its final order on

---

[3] The Board consists of seven members appointed by the Governor, 38 M.R.S. § 341-C(1) (2012), and is a subset of the Department, 38 M.R.S. § 341-A(2) (2012) (stating that the Department consists of the Board and the commissioner).

February 18, 2012, denying the request for a public hearing and affirming the Department's approval of the permit application.

[¶8] Specifically, the Board affirmed the Department's decision to apply the nighttime sound level limit in effect at the time of the order, which was 45 dBA. The Board also found that the visual impact criteria of the Wind Energy Act provided adequate guidance for its consideration of the project, and that neither the Department nor the Board had the authority to treat Webb Lake as a "scenic resource of state or national significance." Friends appealed the Board's order directly to this Court, pursuant to 38 M.R.S. § 346(4) (2012) (providing the Law Court with exclusive jurisdiction to review the Board's final action on expedited wind energy developments).

[¶9] While Saddleback's applications were pending before the Department, the Board, in its role as the body responsible for making rules and providing guidance to the Legislature, was studying the noise emitted by wind energy developments. A petition to amend the noise regulation at 2 C.M.R. 06 096 375-6 to -15 § 10 (2001) was filed with the Board on December 17, 2010, sixty days after Saddleback submitted its permit applications. The Board received comments and evidence regarding the amendment and held a hearing on July 7, 2011. On September 15, 2011—twenty-one days before the Department approved Saddleback's permit limiting the nighttime noise emission to 45 dBA—the Board

provisionally adopted the amendment that, among other changes, lowered the nighttime sound limit for wind energy projects from 45 dBA to 42 dBA. *Compare* 2 C.M.R. 06 096 375-7 § 10(C)(1)(a)(v) (2001) *with* 2 C.M.R. 06 096 375-15 § 10(I)(2)(b) (2012). The Board submitted the rule to the Legislature for final adoption, pursuant to 5 M.R.S. § 8072 (2012). After legislative approval, the amendment went into effect on June 10, 2012.

[¶10] As noted above, the Board's affirmance of the Department's decision to apply the 45 dBA limit to this project occurred on February 15, 2012, five months after the Board adopted the 42 dBA nighttime sound level limits, subject only to final legislative approval.

## II. DISCUSSION

[¶11] Friends asserts that the Board applied the incorrect nighttime sound level limit to Saddleback's permit applications. Additionally, it makes three constitutional arguments, two of which challenge the constitutionality of the Wind Energy Act, with the third argument asserting that the Board and Department violated Friends's due process rights. We review for an abuse of discretion the Board's decision regarding which sound level limit to apply. 5 M.R.S. § 11007(C)(6) (2012). "An abuse of discretion may be found where an appellant demonstrates that the decisionmaker exceeded the bounds of the reasonable choices available to it, considering the facts and circumstances of the particular

case and the governing law." *Sager v. Town of Bowdoinham*, 2004 ME 40, ¶ 11, 845 A.2d 567. Whether the Wind Energy Act is constitutional and whether Friends's due process rights were violated are questions of law we review de novo. *Town of Frye Island v. State*, 2008 ME 27, ¶ 13, 940 A.2d 1065 (regarding constitutionality of statutes); *State v. Bilynsky*, 2008 ME 33, ¶ 5, 942 A.2d 1234 (regarding due process).

A.    Nighttime Sound Level Limits

[¶12] The Board regulates the sound levels of wind projects to protect "the health and welfare of nearby neighbors." 2 C.M.R. 06 096 375-6 § 10(A) (2012). In order to fulfill this goal, the Board's rules provide it with the flexibility necessary to impose limits on proposed wind projects so that sound levels are adequately controlled. 2 C.M.R. 06 096 375-10 § 10(E) (2012).[4] *See also Martha A. Powers Trust v. Bd. of Envtl. Prot.*, 2011 ME 40, ¶ 12, 15 A.3d 1273 (noting that the Board may alter sound level limits). The Department and then the Board are solely responsible for ensuring that wind energy developments do not present

---

[4] The Board has discretion pursuant to 2 C.M.R. 06 096 375-10 § 10(E) (2012):

> The Board may, as a term or condition of approval, establish any reasonable requirement to ensure that the developer has made adequate provision for the control of noise from the development and to reduce the impact of noise on protected locations. Such conditions may include, but are not limited to, enclosing equipment or operations, imposing limits on hours of operation, or requiring the employment of specific design technologies, site design, modes of operation, or traffic patterns.

8

undue hazards to the health of Maine's people.[5]  While acting in its legislative capacity, the Board recognized that the 45 dBA limit did not adequately protect the health and welfare of a project's neighbors.  Here, by applying the 45 dBA limit, the Board failed to meet its statutory obligation to protect the health and welfare of the project's neighbors.  In so doing, it abused its discretion.

[¶13]  Saddleback's permit application shows that the project does meet the 45 dBA nighttime sound level limit, as required by the pre-amendment rules.  *See* 2 C.M.R. 06 096 375-7 § 10(C)(1)(a)(v) (2001).  The application does not show, however, that the project meets the amended nighttime sound level limit of 42 dBA.  *See* 2 C.M.R. 06 096 375-15 § 10(I)(2)(b) (2012).  On appeal, the Board "is not bound by the [acting] commissioner's findings of fact or conclusions of law but may adopt, modify or reverse findings of fact or conclusions of law established by the commissioner."  38 M.R.S. § 341-D(4)(A) (2012).  However, the Board generally must limit its factual consideration to the Department's record.  38 M.R.S. § 341-D(4)(D).  Here, Friends provided the Department with essentially the same evidence it provided the Board regarding the rule amendment.  As a result, the evidence the Board reviewed for the appeal of Saddleback's permit included the evidence that it reviewed for the rule amendment, i.e., the evidence

---

[5]  In addition to issues concerning noise, the Department and Board are also responsible for ensuring that wind power projects do not cause groundwater contamination.  2 C.M.R. 06 096 375-5 § 7 (2012).

that convinced the Board that wind project nighttime noise of 45 dBA or louder has a negative effect on the health of residents who live near wind project sites. Saddleback provided substantial evidence showing that the modeled sound level limit would meet the then-existing level of 45 dBA. It did not attempt to show that the project would meet the 42 dBA limit.

[¶14] The Board does not commit an abuse of discretion simply by making discretionary judgments that we, as a reviewing court, disagree with. *Sager*, 2004 ME 40, ¶ 11, 845 A.2d 567. Here, however, the Board, in its legislative role, explicitly determined that 45 dBA does not protect nearby residents as a nighttime sound level limit for wind projects, but it does nonetheless continue to apply that sound level limit in its adjudicatory role.[6]

[¶15] As discussed above, in its legislative capacity, the Board adopted the reduced sound level limit in order to minimize the impact from wind projects on the health of nearby residents, noting "[t]he available data demonstrates that persons living near existing wind energy development with actual sound level measurements near the 45 dBA limit . . . are experiencing adverse effects." The Board made this finding and took this action *before* Friends appealed the Department's decision to it.

---

[6] Pursuant to 38 M.R.S. § 341-H(1) (2012) the Board is tasked with amending substantive rules, such as the rule at issue here. The Department's staff reviews and comments on the change, but the Board makes the final decision regarding the amendment. *See* 38 M.R.S. § 341-H(3) (2012) (describing the Department's role in rulemaking).

10

[¶16]   Saddleback's noise impact study shows that the modeled nighttime sound level at the most significantly affected residence[7] is 44 dBA, and it asserts that due to the use of conservative models, the monitored level is likely to be even lower.   The Board appeared to rely on this model calibration in its decision to uphold the Department's approval of the permit application, stating:

> If the Board was convinced under specific facts that requiring lower sound levels in the modeling results was necessary in order to achieve adequate control of noise from a development the Board could do so under Chapter 375(10)(E).   However, the Board finds that the Chapter 375 standards currently in effect should adequately control noise due to the reliability of the model and the facts and assumptions used by the applicant in its modeling.

In essence, the Board found that the residents would not be exposed to the effects of 45 dBA nighttime sound levels, but instead the noise would be somewhere below that limit.   There is no indication, however, that the nighttime sound levels would be as low as 42 dBA.[8]

---

[7]   This residence is 1133 meters, or 3716 feet, from the closest turbine.  The buffer area around this residence has a modeled nighttime sound level of 45 dBA.

[8]   It is unclear from the record how the Department and Board intend to enforce sound level limits for wind projects.  In its response to public comment, the Board noted, "[T]he 42 dBA sound limit is an enforceable standard which must be met regardless of pre-development modeling predictions."   The Board's rules provide guidance on obtaining measurements for enforcement, but not on the enforcement procedure.  2 C.M.R. 06 096 375-14 § 10(H)(4.1)(a) (2012).  If the Board enforces the 42 dBA limit after approving the permits pursuant to the 45 dBA limit, then Saddleback is subjected to an unfair double standard.  If the Board enforces the project pursuant to the 45 dBA standard, then any potential benefit is not guaranteed after construction, leaving the residents without protection.  By requiring Saddleback's model to comply with the amended limits, the project is treated with consistency and the residents' health is protected.

[¶17] Because the Board is responsible for regulating sound levels in order to minimize health impacts—and because when doing so it determined that the appropriate nighttime sound level limit to minimize health impacts is 42 dBA—the Board abused its discretion by approving Saddleback's permit applications.[9] Although the project's models predict nighttime sound levels slightly below 45 dBA, the Board failed to give the nearby residents the acknowledged protection of the amended rules. We vacate the Board's order and remand for further review using the 42 dBA nighttime sound level limit as introduced in 2 C.M.R. 06 096 375-15 § 10(I)(2)(b) (2012).

B.      Equal Protection Clause and the Wind Energy Act

[¶18] Friends argues that the Wind Energy Act violates the Equal Protection Clause by refusing to treat Webb Lake as a "scenic resource of state or national significance." Because the users of Webb Lake are not members of a suspect class, Friends must show "(1) that similarly situated persons are not treated equally under the law, and (2) that the statute is not rationally related to a legitimate state interest." *MacImage of Me., LLC v. Androscoggin Cnty.*, 2012 ME 44, ¶ 33, 40 A.3d 975 (quotation marks omitted).

---

[9] To be clear, we do not determine that the provisional rules became applicable to the previously pending application as a matter of law. Rather, in this case, where the Board is directly responsible for protecting the public health, we conclude that the Board cannot ignore its own findings related to public health in deciding whether the project is harmful to the public.

12

[¶19]   When reviewing a permit application pursuant to the Wind Energy Act, the Board determines whether the project "significantly compromises views from a scenic resource of state or national significance."  35-A M.R.S. § 3452(1). The phrase "scenic resource of state or national significance" is defined in relation to "great ponds" in organized areas as:  "One of the 66 great ponds located in the State's organized area identified as having outstanding or significant scenic quality in the 'Maine's Finest Lakes' study . . . ."  35-A M.R.S. § 3451(9)(D)(1).  In 1989, the Department of Conservation's Land Use Regulation Commission conducted an assessment that inventoried a variety of natural values associated with Maine lakes that are ten acres or larger in size.  The findings from this assessment were published in the *MFL Study*, which noted that "these lake ratings should be regarded as minimal findings."  Although Friends presented evidence that Webb Lake meets all of the necessary criteria to have an "outstanding" or "significant" rating in the *MFL Study*, the lake did not receive such a rating.

[¶20]   The Legislature enacted the Wind Energy Act as a means to promote wind as a renewable energy source and streamline the permitting process for wind energy.  *See* 35-A M.R.S. § 3402(1)-(2).[10]  We have previously held that the "state

---

[10]   The general purpose of the Wind Energy Act is stated in 35-A M.R.S. § 3402:

The Legislature finds that it is in the public interest to explore opportunities for and encourage the development, where appropriate, of wind energy production in the State in a manner that is consistent with all state and federal environmental standards and that

interest in facilitating the rapid development of alternative, renewable energy resources" is a legitimate interest that rationally relates to provisions in the Wind Energy Act. *Friends of Lincoln Lakes v. Bd. of Envtl. Prot.*, 2010 ME 18, ¶¶ 1, 30, 989 A.2d 1128 (rejecting an equal protection argument regarding the Board's jurisdiction for wind permit applications and the direct appeals to this Court allowed by the Wind Energy Act). Here, the State streamlined the permitting process by concisely defining a "scenic resource of state or national significance." Because this statutory definition rationally relates to the State's legitimate interest in promoting wind energy and using an efficient permitting process, it does not violate the Equal Protection Clause.

C.      Separation of Powers Clause and the Wind Energy Act

[¶21]  Friends argues that the Wind Energy Act's criteria for assessing visual impact, 35-A M.R.S. § 3452(3), is overly vague and, therefore, it results in an unlawful delegation that violates the Separation of Powers Clause. A statute is not

---

achieves reliable, cost-effective, sustainable energy production on those sites in the State that will attract investment and permit the development of viable wind energy projects. . . .   The Legislature finds it is in the public interest to encourage the construction and operation of community wind power generation facilities in the State.

The Wind Energy Act also states findings related to the regulatory process in 35-A M.R.S. § 3402(2):

The Legislature finds that it is in the public interest to reduce the potential for controversy regarding siting of grid-scale wind energy development by expediting development in places where it is most compatible with existing patterns of development and resource values when considered broadly at the landscape level. Accordingly, the Legislature finds that certain aspects of the State's regulatory process for determining the environmental acceptability of wind energy developments should be modified to encourage the siting of wind energy developments in these areas.

14

an unlawful delegation of power if it offers "an intelligible principle to which the person or body authorized to act is directed to conform." *Uliano v. Bd. of Envtl. Prot.*, 2009 ME 89, ¶ 30, 977 A.2d 400 (quotation marks omitted). In evaluating the statute, we will, if possible, "construe the statute to preserve its constitutionality." *Town of Baldwin v. Carter*, 2002 ME 52, ¶ 9, 794 A.2d 62. Although it is preferable for statutes to have clarity, "[o]bjective quantification, mathematical certainty, and absolute precision are not required by either the United States Constitution or Maine Constitution." *Id.* ¶ 7 n.2.

[¶22] The criteria in dispute consist of six factors the Board considers when making its determination regarding a wind energy project's impact on scenic resources. 35-A M.R.S. § 3452(3)(A)-(F).[11] These criteria are not easily quantified. *See Uliano*, 2009 ME 89, ¶ 30, 977 A.2d 400 (noting that "scenic and aesthetic uses are not readily susceptible to quantitative analysis"). Even the

---

[11] The statute, 35-A M.R.S. § 3452(3)(A)-(F), lists the factors as follows:

**A.** The significance of the potentially affected scenic resource of state or national significance;
**B.** The existing character of the surrounding area;
**C.** The expectations of the typical viewer;
**D.** The expedited wind energy development's purpose and the context of the proposed activity;
**E.** The extent, nature and duration of potentially affected public uses of the scenic resource of state or national significance and the potential effect of the generating facilities' presence on the public's continued use and enjoyment of the scenic resource of state or national significance; and
**F.** The scope and scale of the potential effect of views of the generating facilities on the scenic resource of state or national significance, including but not limited to issues related to the number and extent of turbines visible from the scenic resource of state or national significance, the distance from the scenic resource of state or national significance and the effect of prominent features of the development on the landscape.

Department's expert from Scenic Quality Consultants, who reviewed the visual impact assessment, initially found the criteria difficult to interpret and apply. Regardless, we do not find statutes unconstitutional merely due to difficult application. *See Town of Baldwin*, 2002 ME 52, ¶ 7 n.2, 794 A.2d 62 (discussing the difficulty in defining an "annoying" dog bark). In *Uliano*, we upheld the "existing scenic and aesthetic use standard" of the National Resource Protection Act, 38 M.R.S. § 480-D(1) (2012), despite its non-quantifiable and difficult to apply characteristics. 2009 ME 89, ¶¶ 25-28, 977 A.2d 400. We upheld that statute because it provided sufficient guidance to the agency regarding its application, and any risk that the agency would commit an abuse of discretion was tempered by the Maine Administrative Procedure Act and agency regulations. *Id. See also In re Spring Valley Dev.*, 300 A.2d 736, 749-52 (Me. 1973) (declining to find the Site Location Law unconstitutionally vague). Here, the statute has similar guidance and protections and, therefore, it is not so vague as to constitute a violation of the Separation of Powers Clause.

D.    Due Process Rights and the Bias

[¶23]    Finally, Friends argues that its due process rights were violated because the Department and Board were not impartial fact-finders. Due process requires a fair and unbiased hearing. *Lane Constr. Corp. v. Town of Washington*, 2008 ME 45, ¶ 29, 942 A.2d 1202. In order to show bias, however, Friends must

present evidence sufficient to overcome a presumption that the fact-finders, as state administrators, acted in good faith. *Mallinckrodt LLC v. Littell*, 616 F. Supp. 2d 128, 142 (D. Me. 2009); *see Mutton Hill Estates, Inc. v. Town of Oakland*, 468 A.2d 989, 991 (Me. 1983) (finding bias due to ex parte meetings). Although the Department and Board ruled against Friends, the rulings do not demonstrate bias. As a result, Friends's due process rights were not violated.

The entry is:

> Judgment vacated and remanded for further proceedings consistent with this opinion.

---

**On the briefs:**

Rufus E. Brown, Esq., Brown & Burke, Portland, for appellants Friends of Maine's Mountains, Friends of Saddleback Mountain, and several individuals

William J. Schneider, Attorney General, and Gerald D. Reid, Asst. Atty. Gen., Augusta, for appellee Board of Environmental Protection

Gordon R. Smith, Esq., and Juliet T. Browne, Esq., Verrill Dana, LLP, Portland, for appellee Saddleback Ridge Wind, LLC

**At oral argument:**

Rufus E. Brown, Esq., for appellants Friends of Maine's Mountains, Friends of Saddleback Mountain, and several individuals

Gerald D. Reid, Asst. Atty. Gen., for appellee Board of Environmental Protection

Gordon R. Smith, Esq., for appellee Saddleback Ridge Wind, LLC

Board of Environmental Protection case number L-25137
FOR CLERK REFERENCE ONLY