STATE OF MAINE
KENNEBEC, SS.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. AP-15-31

ROBERT ROSSIGNOL,
      Petitioner

v.                                                    DECISION

MAINE PUBLIC EMPLOYEES
RETIREMENT SYSTEM,
      Respondent

Before the court is Rossignol's petition pursuant to 5 M.R.S.A. §11001 *et seq.* and M.R.C.P. 80C for judicial review of a final agency action of the Respondent's Board of Trustees. Petitioner worked as a special education teacher, but left on April 15, 2010 because of the effect of the students' behavior on him. He suffered from major depressive disorder, generalized anxiety disorder, and panic attacks.

On January 5, 2011, Rossignol applied for benefits from the Maine Public Employees Retirement System (MPERS) for the conditions of major depressive disorder, generalized anxiety disorder, and panic attacks. On May 13, 2011, the Executive Director denied the application finding that the medical evidence was insufficient to determine functional limitation associated with the condition of major depressive disorder and that the medical evidence failed to establish the clinical existence of general anxiety disorder and panic attacks as of his last date in

service, at the time determined to be August 31, 2010. On May 19, 2011, Rossignol appealed. Later, it was discovered that Rossignol's last date in service was April 15, 2010, so the matter was returned to the executive Director for reconsideration. On April 23. 2012, the Executive Director affirmed the denial.

During the appeal, Rossignol submitted additional medical evidence and was permitted to raise the new condition of post-traumatic stress disorder (PTSD). Consequently, the matter was again returned to the Executive Director. On September 21, 2012, the Executive Director reaffirmed the original denial and also denied any benefits based on PTSD.

Upon reconsideration after a hearing, the Executive Director denied benefits again on November 12, 2013.

The parties filed briefs with a Hearing Officer. On September 30, 2014, the Hearing Officer concluded that Rossignol failed to carry his burden to establish that he was disabled within the meaning of 5 M.R.S.A. § 17921(1). Thus, the Hearing Officer recommended that the Board of Trustees affirm the Executive Director's decision to deny disability retirement benefits. On April 9, 2015, the Board of Trustees adopted the Hearing Officer's decision.

On May 13, 2015, Rossignol petitioned this Court to vacate MPERS's Decision and Order, remand to MPERS with instructions to approve Rossignol's application for benefits, and award such further relief as the Court deems proper.

2

Robert Rossignol had several jobs before becoming a special education teacher. He had an Associate's Degree in Accounting and a Bachelor's degree in accounting and business education. He taught business education for about three years, did accounting for three to four years, and worked for L.L. Bean for about three years. He worked as a full-time hairstylist from 1991 through 1998.

In 1998, Rossignol obtained a special education certification and taught at the Edward Little High School in Auburn from 1998 to 2000. Rossignol then worked as a high school special education teacher at Mashwood High School for six years. During that time, Rossignol earned a Master's degree in special education in 2002.

On August 27, 2009, Rossignol began working as a Classroom Special Education Teacher for the Sebago Education Alliance (SEA) regional day treatment program under a probationary contract. His duties included creating and completing lesson plans, individual education plans, and incident reports; grading students; collecting data; supervising students; and teaching all subject areas as a special educator. Rossignol taught from one to seven students at a time, who had emotional, behavioral, and educational disabilities. Rossignol did not have experience working with these kinds of students and lacked the necessary strategies and skills for dealing with the students' behavioral challenges.

3

Rossignol testified that before he began the teaching the program director, Jennifer Searway, promised that he would not be alone in the classroom with the students.[1] Rossignol initially had two education technicians that helped him in the class and the three made a good team. But the technicians eventually left the classroom: one left the program and the other was assigned to help a student outside of the classroom for extended periods of time. This left Rossignol alone with his class.

When he was alone, the students behavior grew out of control and became more aggressive. Rossignol was stressed by this and developed a physical reponse by becoming anxious and fearful about going to work, developing habitual sniffing, had trouble sleeping, had dry heaves on the way to work, and had diarrhea at school about twice a week. He also experienced waking up in the morning sweating, shortness of breath, and heart palpitations.

On April 12, 2010, an assistant special education director from the Westbrook School Department observed Rossignol teaching. The Westbrook educator observed the students' misbehavior and reported it to Searway. Rossignol was so upset that he consulted his doctor, James Donahue, MD. Dr. Donohue diagnosed Rossignol with situational stress disorder resulting in generalized anxiety disorder with associated major depressive disorder and advised Rossignol

---

[1] Denied by Searway.

4

to stay home for the rest of the week. Dr. Donohue said that Rossignol had an inability to work and treated him with an antidepressant and hypnotic for sleep.

Dr. Donohue also referred Rossignol to a Licensed Clinical Social Worker (LCSW), David Ward. LCSW Ward concluded that Rossignol had panic attacks as a direct result of his extreme work condition, but medications were helping. LCSW Ward, nevertheless, recommended that Rossignol take an indefinite break from working at SEA and concluded that it was impossible for Rossignol to return to teaching of any kind permanently.

Rossignol claims that, on April 13, 2010, he spoke to Searway about his mental health, but did not receive any assistance, so he had to leave school. Searway explained that Rossignol told her that he planned to resign due to his long commute, but never notified her of any mental health concerns. Rossignol began unpaid leave of absence on April 15, 2010. Rossignol never returned, so school officials notified Rossignol on June 1, 2010 that his probationary contract would not be renewed.

After seven sessions with LCSW Ward, Rossignol was referred to the MaineGeneral Hospital's partial hospitalization program, where Dr. William Matuzas and Nurse Practitioner Joanne Marmanik diagnosed Rossignol with depressive disorder not otherwise specified, hypertension, and moderate severity of

5

psychosocial stressors. Rossignol started the program in June 2010 and finished in July 2010.

On March 15, 2011, Rossignol saw Carlyle Voss, MD. Based on Rossignol's description of the SEA classroom and on his medical records, Dr. Voss diagnosed Petitioner with major depressive disorder, moderate; and anxiety disorder NOS, with features of post traumatic stress disorder. Dr. Voss stated that Rossignol met the criteria for major depressive disorder when Rossignol left SEA. Dr. Voss also found that Petitioner was globally impaired and unable to work in any capacity at this point. Dr. Voss noted that Rossignol did not meet the main criteria of having witnessed a physical injury or death or having been threatened with that, but did have a number of symptoms of PTSD. Dr.'s Donahue and Sattin, as well as LCSW Ward also included the diagnosis.

Nothing in Rossignol's medical records addressed generalized anxiety disorder until he left SEA in April 2010. LCSW Ward first described Rossignol's anxiety and panic attacks. Dr. Voss disagreed with the diagnosis of generalized anxiety disorder. Dr. Voss also stated that Rossignol experienced panic attacks while working at SEA.

On April 1, 2011, LCSW Ward wrote that Rossignol remained disabled from his teaching position at SEA and is currently unable to work in any capacity. Dr.

6

Donohue wrote that this disability will likely be permanent given that Rossignol is still being treated for unresolved stress related problems.

On April 21, 2011, the MPERS Medical Board agreed with the depression diagnosis, but stated that the major depressive disorder appears to be in remission because of the activities that Rossignol enjoys doing. The Medical Board also noted that there is insufficient evidence to find functional limitations associated with the major depressive disorder diagnosis. The Medical Board agreed that Rossignol had anxiety and panic symptoms, but stated that the records did not show the presence of an anxiety disorder or panic attacks separate from major depressive disorder.

On July 19, 2011, Dr. Albert Drukteinis conducted an independent psychiatric evaluation of Rossignol. Dr. Drukteinis found no significant cognitive dysfunction with Petitioner. Dr. Drukteinis agreed with the diagnosis of major depressive disorder, but suggested that it might be recurrent because Rossignol had twice before received treatment for depression and anxiety. Dr. Drukteinis stated there is not an objectively well-established relationship between Rossignol's mental disorders and his work because of the lack of treatment records at the time Petitioner worked at SEA and the lack of information in personnel records explaining what happened at SEA.

Dr. Drukteinis listed eight potential concerns he had about the lack of objective evidence, such as (1) Rossignol had been treated before for the disorders; (2) Rossignol's depressive symptoms were out of proportion in the extent and duration to the limited time Rossignol experienced stress at SEA; ... (5) Dr. Drukteinis pointed out other factors that affected Petitioner's mental health: a break-up with his partner, the sale of a house and construction of another, reduction in his job responsibilities, a break-up with a new partner followed by a resumption of that relationship, sale of the newly built home and move to Gardiner, new employment in Bath that he left at the end of the school because of philosophical differences, and dealing with should surgery shortly after leaving his job at SEA; ... (8) some exaggeration in Rossignol's psychological testing.

Dr. Drukteinis diagnosed Rossignol with anxiety disorder NOS rather than generalized anxiety disorder and added that Petitioner's symptoms became most pronounced after Rossignol received a letter explaining that his teaching contract would not be renewed.

In a letter dated December 29, 2011, Dr. Donahue stated that Rossignol's limited return to hair styling was affected by panic attacks, short attention span, and hyper vigilance.

On March 22, 2012, the Medical Board affirmed its prior opinion and found there was insufficient support for functional limitations attributable to major depression with anxiety symptoms.

On May 25, 2012, Dr. Dana Sattin, Ph.D. a psychologist noted that Rossignol's symptoms were consistent with the development of PTSD. Dr. Sattin also found that Rossignol's depression was a byproduct of the unexpected change in his career path.

On December 20, 2012, the Medical Board reaffirmed it prior opinions by finding that the functional limitations continued to be unsupported by the evidence. The Medical Board agreed with Dr. Sattin's statement that the records gave the overall impression that Rossignol's symptoms of depression and anxiety occurred or were exacerbated by unexpected change in his career path. The Medical Board affirmed its opinion that Rossignol did not have PTSD because he cannot be diagnosed with it in the absence of actual threatened death or serious injury to himself or another in immediate proximity.

On November 7, 2013, the Medical Board concluded that Rossignol's anxiety and panic attacks were merely symptoms of his major depressive disorder. Thus, the evidence did not support a diagnosis of panic attacks.

On September 20, 2014, the Hearing Officer, F. Mark Terison, completed his evaluation of Rossignol's claims of disability and made the following findings about Petitioner's major depressive disorder, general anxiety disorder and panic attacks, and post-traumatic disorder.

1. Major depressive disorder.

Resolving the conflict in the evidence is a close issue. However, it is Mr. Rossignol's burden to prove by a preponderance of the evidence in the record as a whole that functional limitations associated with major depressive disorder made it impossible for him to work as a special education teacher as of April 15, 2010. The hearing officer must weigh the evidence as a whole, both objective evidence and subjective evidence alike. Unlike Dr. Drukteinis, I do not look for objective evidence connecting the existence of Mr. Rossignol's major depressive disorder to his work at SEA. Rather, I look for functional limitations associated with the major depressive disorder, and whether those limitations made it impossible for Mr. Rossignol to do his job at SEA as of April 15, 2010. Still, I am swayed by Dr. Drukteinis's opinion because he found only "mild difficulties with immediate memory and mental calculations," and "no significant cognitive dysfunction" attributable to Mr. Rossignol's major depressive disorder. Further, I find it significant that there was a lack of aggressive treatment of Mr. Rossignol's condition while he was working at SEA and experiencing the functional limitations claimed. I am also influenced by Mr. Rossignol's own testimony that he did not have experience working with special education students with emotional and behavioral problems, and that he lacked the necessary strategies and skills for dealing with the behavioral challenges that the students posed. My view of the record is that his lack of experience, strategies, and skills far outweighed any limitations to classroom functioning that may have been due to his major depressive disorder. Indeed, even with major depressive disorder Mr. Rossignol testified that he and the two educational technicians originally assigned to his classroom made a "very good" team until one left and the other was assigned to accompany a student who required "one-to-one" supervision for a part of the day. Thus, Mr. Rossignol understood that

10

he functioned well in the classroom under those conditions, even in the face of his mental health challenges. Indeed, at his last date in service he hoped to return to the classroom with the assistance of educational technicians that he wished to be assigned following the visit from the Westbrook educator. With termination of his contract, that could not happen. It was then, Dr. Drukteinis observed, that evidence of inability to function due to major depressive disorder presented itself. I find that the opinion of Dr. Drukteinis and that of the Medical Board carry greater weight than contrary opinion, and thus conclude on the record as a whole that Mr. Rossignol has failed to carry his burden of proof by a preponderance of the evidence.

(Hearing Officer's Recommendation at 13.)

2. General anxiety disorder & panic attacks.

Over all, the question concerning the existence of the conditions of generalized anxiety disorder and panic attacks is a close one, and resolution of the matter depends upon both the burden of proof and the weight assigned to specific evidence. I take seriously the Medical Board's caution about "retroactive clinical formulations," and the necessity of proof of the existence of a condition as of the last date in service. Here, it appears as if the panic attacks and existence of any panic disorder were better demonstrated more than a year-and-a-half following the last date in service than in April 2010. The slowness of Dr. Voss's decision to add a panic disorder weighs heavily. Generalized anxiety disorder, according to Dr. Voss, did not exist at all. Again, I assign great weight to the opinion of Dr. Drukteinis who pointed out that although Mr. Rossignol reported symptoms of severe anxiety and frequent panic attacks while working at SEA, there was no record of medical treatment at the time. The doctor's observation that Mr. Rossignol's symptoms "became most pronounced after he received a letter on 06/01/10 in which his contract for the following school year was not renewed, and he was 'terminated'" is significant and influential. Finally, the Medical Board's opinion that that attacks were merely symptoms of major depressive disorder and not separate diagnosis carries significant weight. Although the question is close, I cannot conclude that Mr. Rossignol has carried his burden to show by a preponderance of the evidence that clinical existence of the

conditions of general anxiety disorder and panic attacks as of April 15, 2010, his last date in service.

(Hearing Officer's Recommendation at 15-16.)

3. Post traumatic stress disorder.

I conclude that the record as a whole does not establish by a preponderance of the evidence that Mr. Rossignol suffered from the condition of PTSD. He has not shown that he experienced, witnessed, or was confronted with an event or events that involved actual or threatened death or serious injury, or a threat to the physical integrity of himself or others. According to the DSM-IV, such an event is necessary to the diagnosis. Lacking any proof of such an event, Mr. Rossignol has not carried his burden of proof.

(Hearing Officer's Recommendation at 16.)

A MPERS "member qualifies for a disability retirement benefit if disabled while in service and ... before normal retirement age." 5 M.R.S.A. § 17924(1). "Disabled" means that the member is mentally or physically incapacitated under the following conditions:

A. The incapacity is expected to be permanent;

B. That it is impossible to perform the duties of the member's employment position.

C. After the incapacity has continued for 2 years, the incapacity must render the member unable to engage in any substantially gainful activity for which the member is qualified by training, education or experience; and

D. The incapacity may be revealed by examinations or tests conducted in accordance with section 17926.

5 M.R.S.A. § 17921(1).

This Court may affirm the agency's decision, remand the case, or modify or reverse the decision. 5 M.R.S.A. § 11007(4)(A)-(C). This Court may "[r]reverse or modify the decision if the administrative findings, inferences, conclusions or decisions are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority of the agency;

(3) Made upon lawful procedure;

(4) Affected by bias or error of law;

(5) Unsupported by substantial evidence on the whole record; or

(6) Arbitrary or capricious or characterized by abuse of discretion.

5 M.R.S.A. § 11007(4)(C).

"A party seeking to overturn an agency decision bears the burden of persuasion on appeal." *Anderson v. Me. Pub. Emples. Ret. Sys.*, 2009 ME 134, ¶ 3, 985 A.2d 501 (citations omitted). When an agency concludes that the party with the burden of proof failed to meet that burden, courts will reverse that determination only if the record compels a contrary conclusion to the exclusion of any other inference. *Kelley v. Me. Pub. Emples. Ret. Sys.*, 2009 ME 27, ¶ 16, 967 A.2d 676 (citation omitted). In other words, "findings of fact of the Board, and other administrative agencies, must be reviewed deferentially, and a court can reverse a finding of failure to meet a burden of proof only if the record compels a

13

contrary conclusion to the exclusion of any other inference." *Anderson v. Me. Pub. Emples. Ret. Sys.*, 2009 ME 134, ¶ 28, 985 A.2d 501 (citations omitted).

"Inconsistent evidence will not render an agency decision unsupported." *Seider*, 2000 ME 206, ¶ 9, 762 A.2d 551, 555 (Me. 2000). The burden of proof rests with the party seeking to overturn the agency's decision. *Seider*, 2000 ME 206, ¶9, 762 A.2d 551, 555 (Me. 2000). The party must prove that no competent evidence supports the Board's decision. *Seider*, 2000 ME 206, ¶9, 762 A.2d 551, 555 (Me. 2000). "The court shall not substitute its judgment for that of the agency on questions of fact." 5 M.R.S.A. § 11007(3).

Rossignol argues that the Board's findings on major depressive disorder, general anxiety disorder and panic attacks are not supported by the record as a whole and that any rational analysis of the record will compel this Court to make contrary conclusion to the exclusion of any other inference. Rossignol does not explain how the record compels a contrary conclusion to the exclusion of any other inference.

Instead, Petitioner identifies the facts that benefit him. Rossignol describes in detail the diagnoses that favor him. He describes diagnoses from Dr. Voss, Dr. Donahue, David Ward, LCSW, Dr. Sattin, and even Dr. Drukteinis and MPERS witness.

14

Although this evidence contradicts other evidence in the Record, it is not enough to render an agency decision unsupported. The Hearing Officer considered all the evidence, even the evidence that favored Rossingol. Although the evidence made this a close case, the Board had enough evidence in the record to support its findings and conclusions. Rossignol has the burden proof here, but he has failed to satisfy that burden. This Court cannot substitute its judgment for the Board's. See *Anderson v. Me. Pub. Emples. Ret. Sys.*, 2009 ME 134, ¶ 28, 985 A.2d 501 (citations omitted).

Rossignol argues that the Board of Trustees acted arbitrarily and capriciously as shown by the bias from the Medical Board, Executive Director, the Hearing Officer, and the Board of Trustees plus the record that supports Rossignol's diagnoses. As explained above, there is no evidence of bias and the record does support the Board's decision, even if there is evidence that supports Rossignol's arguments.

Rossignol insists:

the Medical Board appointed by the System, the Executive Director of the System, the Hearing Officer appointed by the System, and the Board of Trustees of the System share culpability for the System's unjustifiable refusal to extend to Mr. Rossignal the disability retirement benefits to which he is entitled under the law. The collective conduct reflects a clear case of unconscionable bias.

15

Rossignol presents no evidence that the Medical Board, Executive Director, the Hearing Officer, or the Board of Trustees was biased.

Due process requires a fair and unbiased hearing. *Friends of Maine's Mts. V. Bd. Of Envtl. Prot.*, 2013 ME 25 ¶ 23, 61 A.3d 689. To show bias, petitioners must present evidence sufficient to overcome a presumption that the fact-finders, as state administrators, acted in good faith. *Id.* A ruling against a petitioner alone is not sufficient to establish bias. *See id.*

Rossignol argues that he submitted his application for disability-retirement benefits based on the combined effects of severe major depressive disorder, general anxiety with features of post-traumatic stress disorder and panic attacks. Rossignol argues that the Board failed to consider the combined effects, which is required under *Hale-Rice v. Maine State Retirement Sys.*, 1997 ME 64, 691 A.2d 232. In *Hale-Rice*, the plaintiff argued that that Board did not consider the combined effect of her physical and emotional problems. *Hale-Rice*, 1997 ME 64, ¶ 10. The court found that the Board implicitly rejected the plaintiff's factual contention that the combined effects of her problems rendered her disabled. *Id.* ¶ 11. While asserted in his brief, it does not appear that petitioner made the combined effect argument before the agency.

"Generally, plaintiffs in a Rule 80C proceeding for review of final agency action are expected to raise any objections they have before the agency in order to

16

preserve these issues for appeal. Issues not raised at the administrative level are deemed unpreserved for appellate review…. This rule applies even to unpreserved issues implicating constitutional questions…" *New England Whitewater Ctr. v. D.I.F.W.*, 550 A.2d 56, 58 (Me. 1988); *see also Hale-Rice v. Maine State Retirement Sys.*, 1997 ME 64, ¶10 n. 2, 691 A.2d 1232. "An issue is raised and preserved if there was a sufficient basis in the record to alert the court and any opposing party to the existence of that issue." *Verizon New Eng. V. PUC*, 2005 ME 16, ¶ 15, 866 A.2d 844.

Petitioner argues that public policy requires that the Board grant his application for benefits in order to maintain public faith in the Maine Public Employees Retirement System. This Court has no jurisdiction to reverse the Board's decision based on public policy. This Court is bound by the record and will reverse "only if the record compels a contrary conclusion to the exclusion of any other inference. *Kelley v. Me. Pub. Emples. Ret. Sys.*, 2009 ME 27, ¶ 16, 967 A.2d 676 (citation omitted).

For reasons stated herein, the entry will be:

Petition DENIED; the Board of Trustees Decision and Order of April 9, 2015 in Appeal #2011-047 is AFFIRMED.

The clerk may docket by reference.

17

December 1, 2015

JUSTICE, SUPERIOR COURT

18