STATE OF MAINE
KENNEBEC, SS.

SUPERIOR COURT
LOCATION: AUGUSTA
Docket No. AP-14-74

SARA BEHR,

                Petitioner,

v.

MAINE PUBLIC EMPLOYEES
RETIREMENT SYSTEM,

                Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER ON PETITIONER'S M.R. CIV.
P. 80C APPEAL**

Petitioner Sara Behr appeals, pursuant to M.R. Civ. P. 80C, the Final Decision of

the Board of Trustees ("Board") of the Maine Public Employees Retirement System

("MainePERS or System") denying Petitioner disability retirement benefits. In that

Decision, the System acknowledges that Petitioner suffers from fibromyalgia, but

determined that she failed to carry her burden of proof to show that this condition caused

functional limitations that made it impossible for her to perform her job.

As discussed in greater detail below, the Court denies Petitioner's M.R. Civ. P.

80C appeal because even though the evidence could support a finding to the contrary, the

Board's Decision was supported by competent evidence and Petitioner did not make a

sufficient showing to overcome the presumption that the Hearing Officer and Attorney

General's office acted in good faith.

## I.    Background

On December 7, 2012, Petitioner filed her application for disability retirement

benefits based on Lyme disease, mononucleosis, fibromyalgia, Chronic Fatigue

1

Syndrome, PTSD (anxiety, depression), and insomnia. (Record "R." 3.5.) On January 18, 2013, Petitioner took herself out of work and, by February 22, 2013, used up her accrued vacation and sick time. (R. 3.491.) As a result, February 22, 2013 was Petitioner's last date in service with her employer, the Department of Transportation ("DOT"). (*Id.*)

On April 23, 2013, the decision of the Executive Director's Designee ("EDD") issued. (R. 1.1.) The EDD Decision denied Petitioner's application for disability on all conditions. (*Id.*) Of particular relevance, the EDD Decision determined that the medical evidence indicated support for the condition of fibromyalgia, but "the records are insufficient to determine functional limitations, therefore it is not impossible for [Petitioner] to perform the essential duties of [her] job as of February 22, 2013 (last date in service)." (*Id.*)

Petitioner appealed and Jonathan B. Huntington, Esq., was assigned as hearing officer. (R. 2.1; *see* R. 5.1.) On June 19, 2013, a pre-hearing conference was held at which Petitioner withdrew and waived her right to appeal the denial of the conditions of Lyme disease, mononucleosis, PTSD, anxiety, and insomnia. (R. 5.1.) On November 6, 2013, a hearing was held on Petitioner's appeal. (*See* R. 189.1-189.2.) On November 8, 2013, Petitioner withdrew and waived her right to appeal the denial of the condition of Chronic Fatigue Syndrome. (R. 18.1.) Evidence closed on December 4, 2013. (R. 23.1)

On March 6, 2014, the Deputy Executive Director of the System determined there was no basis to change the EDD's decision. (R. 24.1.) This decision was accompanied by two memoranda from the System's Medical Board dated February 6, 2014 and March

2

6, 2014, respectively.[1] On March 10, 2014, a briefing schedule issued and thereafter the parties submitted written argument to the Hearing Officer. (*See* R. 28.1-28.10; 30.1-30.10.) On June 12, 2014, the Hearing Officer issued the Recommended Decision For Comment, for the parties' submission of written comments. (R. 31.3-31.13.) The Recommended Decision for Comments found that Petitioner did not "meet her burden of proving the existence of medically based functional limitations associated with fibromyalgia." (R. 31.13.) It also found that there was a causal relationship between Petitioner's diagnosis of depression and her fibromyalgia. (*Id.*) It explained, however, that the references to "depression" were "more likely references to [the doctors'] impression of [Petitioner's] reaction to her condition" and were "not persuasive indicators of a definitive psychiatric diagnosis of major depressive disorder." (*Id.*)

Petitioner submitted comments to this decision on June 24, 2014. (R. 34.1-34.6.) In her comments, Petitioner agrees that her "major depression episodes are, and were, due to the medical condition of fibromyalgia." (R. 34.1.) On August 7, 2014, the Hearing Officer issued the Final Recommended Decision. (R. 36.2-36.12.) The Final Recommended Decision, as discussed in greater detail below, found Petitioner did not meet her burden of proving medically based functional limitations stemming from her fibromyalgia. (R. 36.12.)

On August 19, 2014, Petitioner requested a review pursuant to System Rule 702(16) and 5 M.R.S. § 17106-A ("section 17106-A review"). (*See* R. 37.1; 38.1.) On September 10, 2014, the section 17106-A review issued and found the Final

---

[1] The Medical Board is a statutorily created group of at least 3 physicians who specialize in various disciplines and whose purpose is to review medical evidence and advise the System, including the EDD and Hearing Officer. *See* 5 M.R.S. § 17106.

3

Recommended Decision contained no errors of law, was supported by the record as a whole, and did not exceed the hearing officer's authority or jurisdiction. (R. 38.1-38.3.) On October 9, 2014, the Board issued its decision adopting and attaching the Hearing Officer's Final Recommended Decision. (R. at 39.2.) This decision was sent to Petitioner in a letter dated October 20, 2014. (R. at 39.1.)

A. The Board's Adopted Decision

The Hearing Officer's Final Recommended Decision adopted by the Board (hereinafter the "Decision") briefly discussed the background and procedural history of the present dispute and then laid out the myriad exhibits and evidence presented before the Hearing Officer. (R. 39.3-39.5.) Following a brief summary of the parties' respective positions, the Decision set forth its findings of fact.

i. *The Decision's Findings of Fact Regarding Petitioner's Medical History*

The Decision explained that the record contains numerous documents showing a number of conditions and treatments from several providers over a four-year period beginning in 2009 and continuing through November 2013. (R. 39.6.) The Decision found that Travis Grondin, D.C., described improvements and exacerbations of Petitioner's condition, but "did not provide functional limitations in his notes." (*Id.* (citing R. 10.116-10.131).) The Decision explained that Dr. Grondin's progress notes stated that Petitioner's condition was chronic, but also provided that Petitioner had no subsequent appointment scheduled and would call when needed. (*Id.* (citing R. 10.117-10.118).)

The Decision then outlined Petitioner's treatment at Augusta Family Medicine and noted that after August 2012, Petitioner's primary care provider became Timothy

4

Nuce, M.D. (*Id.*[2]) In Dr. Nuce's first visit with Petitioner, his notes provide that Petitioner requested multiple referrals to specialists for her fibromyalgia. (*Id.* (citing R. 3.67).) This reference to fibromyalgia, the Decision finds, was the first in Petitioner's history with Augusta Family Medicine and accompanied Petitioner's alleged statement that she has been suffering from fibromyalgia for approximately one year. (*Id.* (citing R. 3.67).) On January 24, 2013, Dr. Nuce assisted Petitioner with paperwork related to medical leave. (*Id.* (citing R. 3.99).)

On August 14, 2013, the Decision explained that Dr. Nuce reviewed an "essentially normal" sleep study and noted that he was unable to find a functional capacity evaluation for Petitioner. (*Id.* (citing R. 10.46).) The Decision then states that at the last visit to Augusta Family Medicine documented in the record, the medical assistant made note of the complaints and history provided by Petitioner. (R. 39.6-39.7 (apparently citing to R. 10.40, which stems from a visit to Dr. Nuce at Winthrop Family Medicine, not Augusta Family Medicine).) Dr. Nuce added to the assistant's notes of Petitioner's complaints that "[d]ue to these symptoms and findings it is impossible for this patient to do her regular job duties and functions," but, the Decision notes, Dr. Nuce did not amplify on the findings or explain the specific limitations or job duties to which he was referring. (R. 39.7 (apparently citing R. 10.42 (" Due to these symptoms and findings it is impossible for this patient to do her regular job duties and functions. I feel

---

[2] The Decision explained that on May 22, 2009, Petitioner reported fatigue and stress, some related to work, and had been treated with Lexapro to address symptoms of depression. (*Id.* (citing R. 3.24; 3.28).) The Decision also noted that in March 2012, a provider at Augusta Family Medicine noted that Petitioner was not experiencing hopelessness, depression, or sadness, and was stable with continuing use of Effexor. (*Id.* (citing R. 3.62).) Subsequently in a September 6, 2012 visit to Augusta Family Medicine, Petitioner expressed that she was unhappy with the care she received at the last practice. (*Id.* (citing R. 3.67).)

that she has most likely exhausted all of the reasonable medical treatments that might restore her to being able to work normally. Unfortunately I think this is more likely permanent. This was discussed with the patient today. She agrees")).)

The Decision then discussed how Petitioner was seen by Catherine Gaynor, F.N.P. beginning in November, 2011. (*Id.* (citing R. 3.224; 3.226; 3.228).) Ms. Gaynor's last note, dated September, 2013, found that Petitioner's fatigue was "complex" and made it "impossible to do job [sic] on some days," but that there was "never a consistent pattern." (*Id.* (citing R. 10.74).) The Decision also discussed Petitioner's treatment with Barbara Cameron, a licensed clinical social worker and Brett VanCott, an acupuncturist. (*Id.* (citing R. 3.185; 3.193; 3.204).)

The Decision then found that, in June of 2012, Petitioner sought care at Inland Rheumatology, but none of the providers at Inland Rheumatology provided any functional limitations related to Petitioner's fibromyalgia. (*Id.* (citing R. 3.298; 10.109).) The Decision noted, however, that Marci Lowe, A.R.N.P. of Inland Rheumatology agreed that a referral for functional capacity testing would be appropriate. (*Id.*)

The Decision explained that Petitioner also saw Frank Gentile, P.T. for neck pain. (*Id.* (citing R. 3.264; 3.98).) The notes from Mr. Gentile's last session with Petitioner noted that she had less neck discomfort, but still had restrictions on her range of motion and that further therapy would focus on the upper cervical and suboccipital regions. (*Id.* (citing R. 3.98).) Finally, the Decision noted that Petitioner was last seen by Matthew Johnson, M.D. of Mental Health Associates of Maine, LLC on September 13, 2013. (*Id.* (citing R. 10.115 September 23, 2013 letter from Dr. Johnson to Nurse Gaynor). Dr. Johnson opined that at the time of his examination, Petitioner had "a mood disorder due

6

to her severe medical condition," which included fibromyalgia. (R. 39.7-39.8 (citing R. 10.115).)

ii.    *The Decision's Findings of Fact Regarding Petitioner's Employment*

The Decision discussed Petitioner's education and the requirements of her position with the DOT. (R. 39.8.) It then discussed her supervisor's testimony that he was satisfied with Petitioner's performance at her job "until a point in 2012 when he began to think she was not qualified to perform the job." (*Id.*) The supervisor prepared a written performance evaluation that he intended to cover the period from December 2009 through December 2011. (*Id.* (citing R. 3.465-3.470).) In the evaluation, he faulted Petitioner for under-performance and for failing to provide the expected level of coaching and counseling to employees under her in the areas of attendance, use of leave time, and internet usage. (*Id.* (citing R. 3.466; 3.468; 21.170-21.177).) The Board also explained that at some point, the dates on the full performance evaluation the supervisor prepared were altered. (*Id.* (citing R. 21.193).) The Board, however, found this immaterial as the altered and unaltered evaluation forms both reflected Petitioner's performance of her duties during 2012. (*Id.*)

The Decision next turned to the testimony of Petitioner's spouse, Christian Behr. (*Id.*) Mr. Behr testified that he began noticing changes in Petitioner's work patterns after December, 2009. He explained that she started having trouble with her physical ability to work during 2011, 2012, and 2013. (*Id.* (citing R. 21.21).) Approximately two years from the date of the Decision, Petitioner began to stay home from work, call in sick, or go to work later in the day than normal. (R. 39.8-39.9 (citing R. 21.9).) The Decision further noted that Petitioner's co-workers noticed changes in her work pattern in the two

7

to three year period preceding her last day at work in January 2013. (R. 39.9 (citing R. 21.64; 21.81-82).) They noticed that she looked fatigued and was absent a great deal during 2012. (*Id.*) One particular employee felt that Petitioner was unable to supervise him properly due to her absences. (*Id.*) The DOT terminated Petitioner on January 25, 2014 due to information it received from Petitioner stating that she would be unable to return from her leave of absence. (*Id.* (citing R. 21.41).)

### iii. *The Decision's Findings of Fact Regarding Petitioner's Functional Limitations*

The Decision found that Petitioner's functional limitations varied from practitioner to practitioner and over time. (R. 39.9.) The Decision explained that after Petitioner left her employment on January 18, 2013, Dr. Nuce opined that her period of incapacity began in 2008. (*Id.* (citing R. 10.9).) The Decision found that this statement was either inconsistent with the other facts in the record or indicates a view that Petitioner's incapacity did not result in limitations interfering with her ability to perform her job functions. (*Id.*) In a note dated July 9, 2013, Dr. Nuce stated that Petitioner was "unable to perform her full time occupational requirements" because of a "medical condition." (*Id.* (citing R. 10.16).) The Decision notes that Dr. Nuce did not specify the limitations or the underlying medical condition. (*Id.*) In a note dated August 26, 2013, Dr. Nuce added that he diagnosed Petitioner with fibromyalgia and was "unable to determine when she can and cannot work." (*Id.* (citing R. 10.20).) Dr. Nuce also wrote that Petitioner needed a "part-time or reduced work schedule of 8 hours per day, 5 days per week, for an unknown, undetermined" period of time and commented that:

> [Petitioner] has fibromyalgia. She has severe headaches, feels pain all over her body, she has sleep disturbance and is tired all the time. I don't

8

have a crystal ball and I am unable to determine when she can and cannot work."

(R. 10.20.)

The Decision then found that a healthcare provider questionnaire dated August 16, 2013, which was signed by Dr. Nuce was actually prepared by Petitioner. (R. 39.9 (citing R. 10.24; 19.3).) The Decision explained that Dr. Nuce "merely affixed his signature to [Petitioner's] statements." (*Id.*)

The Decision also noted that Marci Lowe, A.R.N.P. stated that Petitioner was applying for disability, "which I don't recommend" because, as explained by Petitioner, Ms. Lowe's other patients who were on disability did not come off it. (*Id.* (citing R. 10.109; 21.143).) A month after that note, in September 2013, Ms. Lowe noted that Petitioner's fibromyalgia appeared to be "improved" and that Petitioner appeared "content with [her] current status." (R. 39.10 (citing R. 10.106).) Later in September 2013, Petitioner's nurse practitioner, Ms. Gaynor, noted that fatigue made it impossible for Petitioner to do her job on some days, but that there was "never a consistent pattern." (*Id.* (citing R. 10.74).)

The Decision then noted that Petitioner's supervisor did not observe Petitioner experiencing difficulty with finding words or slurred speech or travelling for work. (*Id.* (citing R. 21.157; 21.166).) Petitioner's supervisor also stated that her mood varied depending on whether she was interacting socially with friends or focusing on her work. (*Id.* (citing R. 21.158).)

iv. *The Decision's Findings of Fact Regarding the Medical Board*

The Decision explained that the Medical Board reviewed Petitioner's records at the time of her application and again after the close of evidence. (*Id.*) Both times, the

9

Medical Board concluded that Petitioner was properly diagnosed with fibromyalgia, but that there was not sufficient corroboration in the medical records for Petitioner's claimed functional limitations. (*Id.* (citing R. 3.502-3.503; 24.2).[3])

v.      *The Decision's Discussion of Petitioner's Functional Limitations*

The Decision found that in light of the evidence presented, there were "significant inconsistencies and voids in the evidence of medically-based functional limitations." (R. 39.12.) This was because the evidence of functional limitations was scattered and inconclusive. (*Id.*) In particular, the Decision noted that following the Medical Board's initial denial of her application for benefits, Petitioner made significant efforts to document her functional limitations.[4] (*Id.*) The Decision concluded that those efforts, however, were "lacking in weight and persuasive force when balanced against the view of the Medical Board which are direct and unmediated." (*Id.*) It also found that some of the evidence Petitioner relied on was not medical opinions from doctors, but reiterations of what the Petitioner told the doctors. (*Id.*) In line with the Medical Board, the Decision gave these "reproduced statements" minimal weight in light of the inconsistent medical opinions presented. (*Id.*) The Decision also noted that it drew an adverse inference against Petitioner's claim due to her failure to introduce a formally conducted and objectively based functional capacity evaluation. (*Id.*)

---

[3] On April 4, 2013, the Medical Board found that Petitioner was properly diagnosed with fibromyalgia, but that it was "unable to determine functional limitations for the condition...due to the lack of objective data in the available medical records." (R. 3.502-3.503.) On February 6, 2014, the Medical Board found that there was no medical information to corroborate Petitioner's perceived limitations. (R. 24.2.) "In fact, the effort involved in compiling her hearing exhibits and her testimony would indicate that she is physically able to perform at least a sedentary job with a reasonably high intellectual capacity." (*Id.*) As a result, the Medical Board maintains there was no medical evidence of any limitations ascribed to fibromyalgia. (*Id.*)
[4] These efforts are discussed in greater detail *infra*, section I(B).

10

The Decision also explained that the healthcare provider questionnaire drafted by Petitioner, but signed by Dr. Nuce, reflects the confusion in the record between what constitutes Petitioner's complaints versus medically based diagnoses from medical professionals. (*Id.*) The Decision noted the questionnaire did not resolve the Medical Board's doubts concerning Petitioner's failure to demonstrate functional limitations. (*Id.*)

The Decision then found that the Medical Board's judgment that Petitioner had not demonstrated functional limitations resulting from her fibromyalgia was consistent with Ms. Lowe's opinion that being on disability would not benefit Petitioner. (R. 39.13.) The Decision stated that—fully accepting Petitioner's added context regarding Ms. Lowe's statement—Ms. Lowe's recommendation only makes sense if she thought being on disability would not benefit Petitioner and was not in her best interests in the long run. (*Id.*) Accordingly, the Decision concluded that Petitioner did not meet her burden of proving the existence of medically based functional limitations associated with fibromyalgia that it made it impossible for her to perform her job. (*Id.*)

Finally, the Decision concluded that Petitioner's depression was "linked" to her fibromyalgia. (*Id.*) However, the Decision determined that "[t]he references to 'depression' during this time period by other providers elsewhere in the record are more likely references to their impression of the [Petitioner's] reaction to her condition and are not persuasive indicators of a definitive psychiatric diagnosis of major depressive disorder." (*Id.*) Accordingly, the Decision affirmed the EDD's decision denying Petitioner's application for disability retirement benefits. (*Id.*)

11

B. Evidence Cited by Petitioner as Demonstrating Functional Limitations

As noted by the Decision, Petitioner undertook significant efforts to document her functional limitations. These efforts are evidenced by Petitioner's Comments on the Hearing Officer's Recommend Decision. (R. 34.1-34.3; *see also* Appendixes A and B to Br. of Pet.) In particular, Petitioner cites to the following evidence allegedly demonstrating functional limitations:

- Timothy Nuce, M.D. stated in an office note on November 29, 2012, under the heading "psychiatric" that Petitioner appeared tired and that her mood was frustrated, unhappy, and tearful. (R. 3.84.)

- Dr. Nuce stated in a November 29, 2012 healthcare provider questionnaire that that due to a number of conditions, including fibromyalgia, Petitioner was unable to be at work, concentrate on tasks, and was easily distracted. Dr. Nuce estimated that Petitioner could work four hours per day for two days per week. He also noted that flare-ups in Petitioner's condition causing extreme joint pain, fatigue, generalized pain in muscles, and headaches will occur and prevent Petitioner from working. (R. 3.487-3.489.)

- Dr. Nuce stated in a Healthcare Provider's Report signed on December 26, 2012, that Petitioner's behavior and ability to relate to others is passive, she has psychomotor retardation, her speech is slow and quiet, her mood is depressed and she has a tearful affect, and flow of thought is coherent and preservative on fibromyalgia. (R. 3.321.)

- Dr. Nuce stated in a January 24, 2013 healthcare provider questionnaire that Petitioner is unable to perform job functions including being at work, poor to zero concentration on tasks, easily distracted, fatigue and severe pain. Dr. Nuce also opines that Petitioner can work 8 hours per day for 5 days per week. He notes, however, that Petitioner's condition can cause episodic flare-ups that would prevent her from working due to extreme joint pain, fatigue, generalized muscle pain, and headaches. Dr. Nuce further opines that the flare-ups are likely to occur five times per week, twelve months per year and that their duration is likely to be eight hours or five days per episode. (R. at 10.8-10.10.)

- Catherine Gaynor, F. N.P. noted in a July 19, 2012 healthcare provider questionnaire that Petitioner is unable to perform at least some of her job functions because she needs flexibility in her work hours to fit her

12

fatigue syndrome. She also estimates that Petitioner can work full time, but requires flexibility in the start of the day and may suffer from episodic flare-ups that could periodically prevent Petitioner from performing her job function. (R. 3.480-3.481.)

- Ms. Gaynor also diagnosed Petitioner as having chronic, persistent fatigue that interferes with her ability to concentrate and work long hours in a January 15, 2013 Healthcare Provider's Report. She further diagnosed Petitioner with fibromyalgia and stated that it fatigues her body through the day and creates distraction and pain. (R. 3.209-3.215.)

- Physical Therapist Frank Gentile stated in a progress report from November 15, 2012, that Petitioner has made partial progress and reports decreased symptoms of neck pain at rest and during activities such as sitting and driving. (R. 3.81.)

- Travis Grondin, D.C., who works at Capital City Chiropractic, noted in a December 12, 2012 progress report that Petitioner stated that she has low back pain that "is reported to be more uncomfortable as a result of bending, carrying, driving, and lifting." (R. 3.410.)

- Licensed Clinical Psychologist Dr. Christopher Muncie wrote a letter to the System on January 10, 2013, in which he opined that Petitioner's physical conditions have worsened over time, which has caused her to feel frequently fatigued and in pain. This, in turn, negatively impacts her ability to undertake tasks at work and at home. Dr. Muncie notes that Petitioner has felt increasingly frustrated, down, and guilty because of her inability to undertake tasks and because of the fact that she has been required to miss increasing amounts of work. (R. 3.254.)

## II. Discussion

The Court reviews the Board's Decision for an abuse of discretion, error of law, or findings not supported by the evidence. *Uliano v. Bd. of Envtl. Prot.*, 2009 ME 89, ¶ 12, 977 A.2d 400 (citation omitted). "An administrative decision will be sustained if, on the basis of the entire record before it, the agency could have fairly and reasonably found the facts as it did." *Id.* (quoting *CWCO, Inc. v. Superintendent of Ins.*, 1997 ME 226, ¶ 6, 703 A.2d 1258). Where a petitioner challenges the findings in an administrative decision,

13

the petitioner "cannot prevail unless [s]he shows that the record compels contrary findings." *Id.* (quoting *Kroeger v. Dep't of Envtl. Prot.*, 2005 ME 50, ¶ 8, 870 A.2d 566). "Inconsistent evidence will not render an agency decision unsupported." *Id.* (quoting *Seider v. Bd. of Exam'rs of Psychologists*, 2000 ME 206, ¶ 9, 762 A.2d 551); *see also Dodd v. Secretary of State*, 526 A.2d 583, 584 (Me. 1987) ("The court may not substitute its judgment for that of the agency merely because the evidence could give rise to more than one result"). Stated differently, a "party seeking review of an agency's findings must prove that they are unsupported by any competent evidence." *Maine Baker's Ass'n v. Bureau of Banking*, 684 A.2d 1304, 1306 (Me. 1996). Furthermore, the court "will not overrule findings of fact supported by substantial evidence, defined as 'such relevant evidence as a reasonable mind might accept as adequate to support the resultant conclusion.'" *Lewiston Daily Sun v. Maine Unemployment Ins. Comm'n*, 1999 ME 90, ¶ 7, 733 A.2d 344 (quoting *Crocker v. Maine Unemployment Ins. Comm'n*, 450 A.2d 469, 471 (Me. 1982)).

The party seeking to vacate an agency decision bears the burden of persuasion. *Kelley v. Me. Pub. Emps. Ret. Sys.*, 2009 ME 27, ¶ 16, 967 A.2d 676. "When an agency concludes that the party with the burden of proof failed to meet that burden, [the court] will reverse that determination only if the record compels a contrary conclusion to the exclusion of any other inference." *Id.* (quoting *Hale–Rice v. Me. State Ret. Sys.*, 1997 ME 64, ¶ 17, 691 A.2d 1232).

A. Whether the Board Erred in Finding that Petitioner Has No Functional Limitations

Petitioner's primary argument is that she satisfied her burden of proof regarding functional limitations associated with fibromyalgia as demonstrated by her argument at

14

R. 37.2-37.15 and 34.1-34.6. In particular, she points to the evidence referenced in Appendixes A and B to her brief, reproduced in pertinent part from R. 34.1-34.3, as proof that she has demonstrated her functional limitations. In addition to this failing, Petitioner argues that the System failed to meet the requirement of 5 M.R.S. § 17106(4)(D) to offer to review the decision and the records supporting the decision with Petitioner prior to issuing a determination. (Br. of Pet. 2.)

Furthermore, Petitioner contends that the Hearing Officer's comment that Petitioner "did not introduce a formally conducted and objectively based functional capacity evaluation into evidence" is of limited significance because said evaluation is not required by rule or statute. (*Id.* at 11.) In addition, Petitioner contends the Medical Board's findings are of limited relevance because they were made before Petitioner compiled her list of functional limitations, as set forth in Appendixes A and B. (*Id.* at 12.)

Petitioner further objects to the Board's reliance on evidentiary items that were past Petitioner's last day in service on February 22, 2013. In particular, Petitioner points to a note from Marci Lowe ARNP signed on July 8, 2013 stating under her impression for fibromyalgia that Petitioner "is applying for disability, which I don't recommend, and would like referral for FCT." (R. 10.108-10.110.) In addition to coming after Petitioner's last day in service, Petitioner contends that Ms. Lowe's statement is incomplete because it does not indicate that she made the statement because "everyone she's ever known that's gone on disability has never come off from it." (R. 21.143.) In other words, Petitioner contends that Ms. Lowe's statement does not imply Petitioner would not qualify for disability. Petitioner also objects to the Board's reliance on—and

15

inferences drawn from—an August 16, 2013 healthcare provider questionnaire filled out by Dr. Nuce as untimely. (R. 37.26-37.33.)

The System argues that the Board did not err in finding that Petitioner had no functional limitations. (Br. of Resp. 4.) The System points out that although expert medical evidence is not necessary to demonstrate functional limitations, a lack of expert medical evidence "cannot be ignored or considered irrelevant to the ultimate determination." (*Id.*) More pointedly, the System argues that Petitioner had the opportunity to undergo a functional capacity evaluation, but did not. (*Id.* at 10-11.) The System also argues that it was not required to provide testing to Petitioner and that her argument to the contrary is groundless. (*Id.* at 13-14.)

The System further claims that the Decision was adequately supported by the memoranda prepared by the Medical Board, which concluded that the medical records produced did not corroborate Petitioner's claimed limitations stemming from fibromyalgia. (*Id.* at 5.) In addition, the System disputes Petitioner's argument that the Medical Board failed to review the functional limitations pointed out by Petitioner in her Appendix A. (*Id.* at 11.) The System claims that in making this argument, Petitioner ignores the fact that record evidence in the administrative appeal closed on December 4, 2013, before Appendix A was created. (*Id.* at 11-12.) As a result, the System claims the Hearing Officer did not err by treating the Appendix as argument, not evidence.

The System then argues that the Decision was supported by Petitioner's employment history, which indicated that Petitioner left her employment because of performance problems and work-related stress rather than functional limitations brought on by fibromyalgia. (*Id.* at 8-9.)

16

In addition, the System argues that the record is silent as to whether an offer was made to review the initial EDD decision and medical records with the Petitioner pursuant to 5 M.R.S. § 17106(4)(D). (*Id.* at 12-13.) The System argues that even if that were the case, the Petitioner did not object to this alleged procedural defect and, in any event has not shown any prejudice demonstrating a denial of due process. (*Id.* at 13 (citing *In re: Maine Clean Fuels, Inc.*, 310 A.2d 736, 744 (Me. 1973).)

In her reply, Petitioner reiterates her contention that the Board erred by relying on Dr. Nuce's August 16, 2013 healthcare provider questionnaire, and Ms. Lowe's July 8, 2013 note because they are past Petitioner's last day in service of February 22, 2013. Petitioner contends that the Board compounded this error by relying on and giving "explicit and implicit preferential weight" to this "invalid" evidence. (Reply of Pet. 5.[5])

Petitioner further replies that the record contains "sufficient objective functional limitations" to prove that it "was impossible for the Petitioner to perform job duties as of February 22, 2013 due to functional limitations associated with fibromyalgia." (*Id.* at 6.) She argues that the Hearing Officer and Respondent failed to provide any specific examples of the variation of functional limitations found by the practitioner's over time and, as a result, can only state that there is no variation in the functional limitations identified by her various practitioners. (*Id.*) Petitioner then asserts that fibromyalgia comes on slowly, causes functional limitations to wax and wane, even within a day, and that this information can be located by a simple internet search carried out by a layperson. (*Id.*)

---

[5] Petitioner also confirms that she is not seeking disability retirement benefits due to depression and explains that she experienced a mood disorder and severe depression upon being diagnosed with fibromyalgia and learning that the resulting changes are likely to be permanent. (Reply of Pet. 9.)

Petitioner also replies that she did not leave her position with the DOT due to work problems and stress. (*Id.* at 9-12.) Instead, she left her position based in part on the DOT's recommendation that she apply for long-term disability due to the DOT's inability to provide any job modifications, reasonable accommodations or another position because of Petitioner's functional limitations of being absent from work and inability to predictably work. (*Id.* at 10.) She contends this is supported by the DOT's termination letter (R. 21.232), which explained that the DOT was terminating her due to her high rate of absenteeism, not for performance related issues. (Reply of Pet. 11.) She also argues that her supervisor's testimony that in 2012 he began to think she was not qualified to perform the job, should not be afforded much weight because a reasonable person would question why it took the supervisor from 2009 until 2012 to question her performance. (*Id.* at 11.) She further explains that any stress or decline in work performance was due to her fibromyalgia and, if anything, serves as evidence of her functional limitations. (*Id.* at 12.)

Petitioner further argues that the System's reliance on the lack of a functional capacity evaluation improperly shifts the burden to Petitioner. (*Id.* at 15.) She explains that she did not learn about the evaluation until mid-2013 and that she incurred complications in setting up the test and that the results were unlikely to be available. (*Id.*) Furthermore, she claims the test would be inadmissible because it would have been evidence created after February 22, 2013. (*Id.*)

Petitioner also points out that while Appendixes A and B were not admitted before evidence closed, the underlying evidenced cited therein was before the Medical Board and Hearing Officer. (*Id.* at 18.) In addition, Petitioner reiterates her argument

18

that the System failed to meet the requirements of 5 M.R.S. § 17106(4)(D)—requiring the System to offer to review the Medical Board's decision and the records supporting that decision with the applicant prior to issuing a determination—and that this warrants reversal of the Decision.[6] (*Id.*)

5 M.R.S. § 17924 provides that "a member qualifies for a disability retirement benefit if disabled while in service and...before normal retirement age." Section 17921(1) defines "disabled" as meaning:

> [T]he member is mentally or physically incapacitated under the following conditions:
>
> A. The incapacity is expected to be permanent;
> B. That it is impossible to perform the duties of the member's employment position [i.e. functional limitations];
> C. After the incapacity has continued for 2 years, the incapacity must render the member unable to engage in any substantially gainful activity for which the member is qualified by training, education or experience; and
> D. The incapacity may be revealed by examinations or tests conducted in accordance with section 17926.

5 M.R.S. § 17921(1).

Section 17106-A(1), regarding the requirement of independent decision makers, states, in pertinent part:

> All hearing officers are independent decision makers and are authorized to make recommended final decisions in regard to matters that come before them, consistent with applicable statutes and rules...[and that] [t]he board shall accept the recommended decision of the hearing officer unless the recommended decision is not supported by the record as a whole... the...hearing officer has made an error of law or the decision exceeds the authority or jurisdiction conferred upon the hearing officer....

---

[6] Following oral argument on June 3, 2015, Petitioner filed an opposition to Rule 80C oral argument that, in substance, reiterated the arguments made in her briefing.

19

5 M.R.S. § 17106-A(1). In reaching a decision, the EDD, Hearing Officer and Board receive advice from the Medical Board. 5 M.R.S. § 17106(3). In particular,

> The medical board…shall review the file of an applicant for disability retirement and…[p]rovide a written report of its analysis of how the applicant's medical records do or do not demonstrate the existence of physical or mental functional limitations entitling an applicant to benefits….

5 M.R.S. § 17106(3)(D). These medical board memoranda exist "to inform the executive director and Board as to the medical board's view on the existence of a disability that would entitle an applicant to benefits." *Kelley v. Me. Pub. Emps. Ret. Sys.*, 2009 ME 27, ¶ 25, 967A.2D 676 (noting that the Medical Board serves as "an advisor" to the System). As such, Medical Board memoranda evaluating an applicant's medical evidence may be considered as contrary medical opinion. *Anderson v. Me. Pub. Emps. Ret. Sys.*, 2009 ME 134, ¶ 28, 985 A.2d 501.

Here, the Petitioner has not met her burden of demonstrating that the Board's Decision was not supported by any competent evidence. *Uliano*, 2009 ME 89, ¶ 12, 977 A.2d 400; *Maine Baker's Ass'n*, 684 A.2d at 1306. This is because the Board acted within its discretion when it drew adverse inferences against the Petitioner based on Dr. Nuce's failure to elaborate upon Petitioner's functional limitations. (R. 39.7 (citing R 10.16; 10.20; 10.42).) Similarly, the Board did not abuse its discretion by discounting the credibility and weight of the portion of the healthcare provider questionnaire drafted by Petitioner, but signed by Dr. Nuce. (R. 39.9 (citing R. 10.24; 19.3). Furthermore, although Petitioner is correct that she was not required to undergo and submit a formally conducted functional capacity evaluation in support of her claim, the Board did not abuse

20

its discretion by inferring that this failure indicated that Petitioner did not suffer from functional limitations. (R. 39.12.)

In addition, the Board did not abuse its discretion by finding that the medical evidence presented did not paint a consistent picture of Petitioner suffering from functional limitations associated with fibromyalgia that made it impossible for her to perform her job. (*See* R. 39.12-39.13,) This finding was supported by the Board's discussion of and citation to numerous medical records including: 1) Dr. Grondin's finding that Petitioner's condition was chronic contrasted with his statement that she had no subsequent appointment scheduled and would call when needed, and the absence of functional limitations contained in Dr. Grondin's notes (R. 10.116-10.118; *see also* R. 10.116-10.131); 2) Nurse Practitioner Gaynor's note that there was "never a consistent pattern" to Petitioner's fatigue (R. 10.74); and 3) Nurse Practitioner Lowe's note that she didn't recommend Petitioner applying for disability (R. 10.109). While Petitioner criticizes Ms. Lowe's note for failing to explain that she only made that statement because her other patients who were on disability did not come off it, the Board determined that this recommendation "makes sense only with the further inference that, in Ms. Lowe's opinion, being on disability would not benefit the [Petitioner] and would not be in the best medical interests of the [Petitioner] in the long run." (R. 39.13.) The Board acted within its discretion in drawing this, and the above-mentioned conclusions regarding Petitioner's lack of consistent functional limitations.

While Petitioner cited to evidence in the record that arguably supports her claim of functional limitations, "[i]nconsistent evidence will not render an agency decision unsupported." *Uliano*, 2009 ME 89, ¶ 12, 977 A.2d 400. In addition, Petitioner's

contention that the Medical Board's findings are of limited relevance because they were made before Petitioner compiled her list of functional limitations ignores the fact that the Medical Board had the vast majority of evidence in the record before it when it made its findings. (*See* R. 3.502-3.503 (one of numerous documents in the System appeal packet); R 24.2 (issued after the aforementioned memoranda and reviewing new information).) Furthermore, Petitioner's objection to the Board relying on evidentiary items generated after Petitioner's last day of service on February 22, 2013 lacks grounding in the statute or the System's rules. While Petitioner is correct that the issue presented was whether she had demonstrated sufficient functional limitations as of February 22, 2013, this does not mean that evidence generated after that date is not relevant to that determination or cannot be considered in making said determination. To the contrary, 5 M.R.S. § 17929(2)(B) indicates an ongoing interest in the Petitioner's qualification for disability retirement benefits by contemplating subsequent scrutiny of the Petitioner's qualification after an award has been made.

Finally, while the lack of evidence that the System complied with the requirement of 5 M.R.S. § 17106(4)(D)—to offer to review the Medical Board's decision and records supporting that decision with the Petitioner—indicates the System did not, in fact, meet said requirement, the Petitioner has not argued, or pointed to any evidence indicating that this alleged failure prejudiced the Petitioner. To the contrary, the Petitioner has demonstrated an informed take on the argument of the Medical Board and the record as a whole. Absent prejudice stemming from this alleged error there is no ground to vacate or reverse the Board's Decision. *See In re: Maine Clean Fuels, Inc.*, 310 A.2d at 744 ("relaxation or modification of procedural rules by an administrative agency does not

22

constitute reversible error absent a showing of injury or substantial prejudice") (quotation omitted); *see also Motley-Motley, Inc. v. PCHB*, 110 P.3d 812, 822 (Wash. App. 2005) ("an agency's failure to comply with its own procedures does not establish a due process violation. Instead, to constitute a violation, the party must be prejudiced") (citation omitted).[7] Accordingly, because Petitioner has not demonstrated that the Board's Decision was unsupported by competent evidence, the Court must uphold the Decision's denial of disability retirement benefits.

## B. Petitioner's Allegations of Bias

Petitioner claims the Hearing Officer was biased against her as evidenced by the tone in the Recommended Final Decision, subsequently adopted by the Board. In particular, she contends the Decision is "very defensive and unprofessional" as evidenced by using the terminology that Petitioner "took issue with," "amplified," and "criticized" the Hearing Officer's Recommend Decision for Comments. (Br. of Pet. 6.) She also asserts bias based on the evidence the Hearing Officer relied upon, gave weight to, and discredited. (*Id.* at 6-9.)

Petitioner also asserts that the review by the AG's office demonstrated bias. (*Id.* at 9.) She asserts that the AG's office disregarded the System's failure to meet statutory obligations and requirements, presumed the evidence used by the Hearing Officer beyond February 22, 2013 was appropriate, and dodged issues raised by Petitioner. (*Id.*)

The System responds that Petitioner has not alleged bias with sufficient particularity. (Br. of Resp. 9-10.) In particular, it argues that Petitioner's claims of bias

---

[7] Petitioner's arguments that she did not leave her position with DOT due to work problems and stress must also fail because, as discussed above, competent evidence support's the Board's Decision and, in any event, the Board's Decision did not rely on this finding or the testimony of Petitioner's supervisor in reaching its Decision.

are more accurately complaints about the facts found, the credibility of those facts, and the weight accorded those facts.

Petitioner replies that her assertion of bias against the AG's office is supported by the fact that the office did not even acknowledge the specific statutory errors the Petitioner put forward for review. (Reply of Pet. 13.) Instead, the AG's office provided case law supporting the Board's decision, and further evidencing bias against Petitioner. (*Id.*) This alleged failure to carry out a proper review, Petitioner argues, prevented Petitioner from going to the Board with any type of sufficient review and feedback. (*Id.* at 14.)

Petitioner further argues that the Hearing Officer demonstrated bias by failing to acknowledge the testimony of Christy Cross, from the DOT, that it was impossible for Petitioner to perform her essential job duties on February 22, 2013. (*Id.*)

"Due process requires a fair and unbiased hearing." *See Friends of Maine's Mountains v. Bd. of Envtl Prot.*, 2013 ME 25, ¶ 23, 61 A.3d 689 (citation omitted). "In order to show bias [a petitioner] must present evidence sufficient to overcome a presumption that the fact-finders, as state administrators acted in good faith." *Id.* (citations omitted). Ruling against a party, in itself, does not demonstrate bias. *See id.*

Here, the Petitioner has not presented evidence sufficient to overcome the presumption that the Hearing Officer and AG's office acted in good faith. As the System points out, many of Petitioner's allegations of bias are based on the Hearing Officer's proper exercise of his discretion in weighing the evidence. Furthermore, given the size of the record before the Hearing Officer, the fact that he did not explicitly address evidence the Petitioner found compelling does not demonstrate bias. In addition, the terminology

24

used by the Hearing Officer in his decisions does not demonstrate bias. A showing of bias cannot be sustained based on isolated words and phrases that could, under one of many possible interpretations, demonstrate "defensive" behavior. Similarly, the Petitioner's allegations of "bias" against the AG's office are better characterized as alleged errors of law. Even assuming that AG's office committed errors of law in its review, which the Court is not finding, these errors are not sufficient to demonstrate bias.

C. Petitioner's Request that the Administrative Record be Kept Confidential

Petitioner requests that the administrative record be kept confidential because her social security number is scattered throughout and the record also contains information on family member's medical conditions. Petitioner did not, however, identify where any of the allegedly confidential information is located within the record.

In *Bailey v. Sears, Roebuck & Co.*, the Law Court quoted a First Circuit opinion, which concluded that "non-disclosure of judicial records could be justified only by the most compelling reasons. 651 A.2d 840, 844-845 (Me. 1994) (quoting and discussing *Poliquin v. Garden Way, Inc.*, 989 F.2d 527, 533 (1st Cir. 1993)). On the other hand, 19 M.R.S. § 908, Administrative Order JB-09-02 and Administrative Order JB 05-20 dictate that—at a minimum—Petitioner's social security number should remain confidential. 19 M.R.S. § 908 (with regard to the disclosure and recording of social security numbers in divorce actions, section 908 provides that "[t]he record of an individual's social security number is confidential and not open to the public"); JB-09-02 (providing stringent limitations as to who may obtain social security numbers maintained in court files); JB-05-20(II)(B) (limiting the availability of confidential information which includes information made confidential by a statute, policy, Administrative Order, or rule).

25

Here, Petitioner has not put forward "the most compelling reasons" to keep the entire record confidential. The Court is, however, willing to redact portions of the record that contain confidential information. In particular, the Court is willing to redact Petitioner's social security number from the record. It is also willing to redact additional information if Petitioner demonstrates that it is confidential. In light of the voluminous record, however, the Court requires Petitioner to identify the precise pages on which her social security number appears. In addition, the Court requires Petitioner to point out the precise pages on which the additional, allegedly confidential information exists and the particular statute, policy, rule, case law, or administrative order that protects the information as confidential. The Court grants Petitioner 30 days to submit a letter and/or memoranda identifying the above mentioned information and, if necessary, will consider extending this time period.

## III. Conclusion

The Court **denies** Petitioner's M.R. Civ. P. 80C appeal because even though the evidence could support a finding to the contrary, the Board's Decision was supported by competent evidence and Petitioner did not make a sufficient showing to overcome the presumption that the Hearing Officer and AG's office acted in good faith. In addition, the Court grants Petitioner 30 days to submit a letter and/or memoranda identifying the confidential information she seeks to redact.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Order by reference in the docket.

Dated: July 23, 2015

Michaela Murphy, Justice
Maine Superior Court

26

| Date Filed | 11/19/14 | Kennebec County | Docket No. AP-14-74 | F |

Action: <u>Petition for Review</u>
        80C

**J. Murphy**

| Sara Behr | vs. | Maine Public Employees Retirement System |

---

| Plaintiff's Attorney | Defendant's Attorney |

Sara Behr
59 Charles Street
Winthrop, ME 04364

Christopher Mann, AAG
6 State House Station
Augusta, ME 04333-0006

Date of Entry

---

| | |
|---|---|
| 12/10/14 | Petition for Review of Final Agency Action, filed 11/19/14. s/Behr, Pro Se |
| 12/10/14 | -Certified Mail Return Receipt, addressed to Office of the Attorney General, date of delivery 11/20/14, no signature, filed 11/25/14. s/Behr, Pro Se<br>-Certified Mail Return Receipt, addressed to MainePERS, date of delivery 11/20/14, no signature, filed 11/25/14. s/Behr, Pro Se |
| 12/10/14 | Letter entering appearance for MainePERS, filed 11/25/14. s/Mann, AAG |
| 12/18/14 | Administrative Record, filed. s/Emery, Appeals Clerk<br>Certificate of Administrative Record, filed. s/Milazzo, Esq. |
| 12/18/14 | Notice and Briefing Schedule issued.<br>Copy to Petitioner and AAG Mann |
| 1/7/15 | Two documents to supplement the Record, which were inadvertently left out of the Record filed 12/18/14, filed 1/2/14. s/Emery, Appeals Clerk |
| 1/22/15 | Letter, with attachments, regarding reasons for delay to review entire record, filed. s/Behr, Pro Se |
| 2/4/15 | Opposition to Motions to Continue and to Modify, filed 1/30/15. s/Mann, AAG |
| 2/12/15 | Letter regarding incomplete filing dated 1/30/15, Brief, and signature page, filed 2/5/15. s/Behr, Pro Se |
| 2/12/15 | Response to Opposition to Motions to Continue and to Modify, filed 2/5/15. s/Behr, Pro Se |
| 2/21/15 | ORDER, Murphy, J. (2/20/15)<br>Petitioner's brief is accepted. However, the request to modify the record is DENIED. State shall file its brief by 3/20/15 and Petitioner has until 3/30/15 to file any reply.<br>Copy to Petitioner and AAG Mann |
| 3/3/15 | Opposition to Rule 80(C) Brief, filed 2/23/15. s/Mann, AAG |

3/10/15      Response to Opposition to Rule 80(C) Brief and Appendix A, filed 3/4/15. s/Behr, Pro Se

4/14/15      Oral argument scheduled for 6/3/15 at 10:00 a.m.
Notice of Hearing sent to Petitioner and AAG Mann

6/3/15      Hearing held, J. Murphy presiding. Sara Behr, Pro Se and Christopher Mann, AAG
Courtroom 5 - 10:15:59 to 10:29:03
Under advisement

6/9/15      Opposition to Rule 80(C) Oral Argument, filed 6/8/15. s/Behr, Pro Se

7/23/15      ORDER ON PETITIONER'S M.R.CIV. P. 80C APPEAL, Murphy, J.
The Court **denies** Petitioner's M.R. Civ. P. 80C appeal because even though the evidence could support a finding to the contrary, the Board's Decision was supported by competent evidence and Petitioner did not make a sufficient showing to overcome the presumption that the Hearing Officer and AG's office acted in good faith. In addition, the Court grants Petitioner 30 days to submit a letter and/or memoranda identifying the confidential information she seeks to redact.
The Clerk is directed to incorporate this Order by reference in the docket.
Copy to Petitioner and AAG Mann
Copy to Repositories

7/23/15      Notice of removal of Record sent to AAG Mann.